1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4  In Re:                    ) Case No. 8:06-bk-10373-ES
                             )
5  JAY JOHNSON,              ) Chapter 7
                             )
6          Debtor.           ) Santa Ana, California
   _____    ) Friday, February 28, 2014
7                            ) 9:00 a.m.
   GONZALEZ, ET AL.,         )
8                            ) Adv. No. 8:06-ap-01313-ES
           Plaintiffs,       )
9                            )
       vs.                   )
10                           )
   Jj & A ARCHITECTS, INC.,  )
11 ET AL.,                   )
                             )
12         Defendants.       )
   _____    )
13
                             CONT'D TRIAL RE: COMPLAINT TO
14                           AVOID AND RECOVER FRAUDULENT
                             TRANSFERS PURSUANT TO 11
15                           U.S.C. 544 AND 550, and
                             CALIFORNIA CIVIL CODE 3439.04,
16                           3439.05 AND 3439.07 FOR
                             CONSTRUCTIVE TRUSTS; AND
17                           INJUNCTIVE RELIEF

18                 TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ERITHE SMITH
19              UNITED STATES BANKRUPTCY JUDGE

20 APPEARANCES:

21 For the Plaintiffs:       JAMES A. HINDS, ESQ.
                             Hinds & Shankman, LLP
22                           21257 Hawthorne Boulevard
                             Second Floor
23                           Torrance, California 90503
                             (310) 316-0500
24

25 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1   APPEARANCES:  (cont'd.)

2   For the Plaintiffs:          CRISTINA F. KEITH, ESQ.
                                 Fogle, Keller & Purdy
3                                300 East Main Street
                                 Suite 400
4                                Lexington, KY 40507

5   For the Defendants:          BURTON v. MCCULLOUGH, ESQ.
                                 4205 Encinas Drive
6                                La Canada, California 91011
                                 (818) 952-5596
7

8   Court Recorder:              R. Reid
                                 United States Bankruptcy Court
9                                411 West Fourth Street
                                 Suite 2030
10                               Santa Ana, California 92701

11  Transcriber:                 Briggs Reporting Company, Inc.
                                 4455 Morena Boulevard
12                               Suite 104
                                 San Diego, California 92117
13                               (310) 410-4151

14

15

16

17

18

19

20

21

22

23

24

25

iii

1                    I N D E X

2   WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

3   Richard Lapides           --      7        --        --

4
    EXHIBITS:                            IDENTIFIED   RECEIVED
5   Joint Exhibits:

6
    154        Jj & A ledger                160         --
7
    154.010    Check for $10,000 to Randal  161         --
8              Johnson for Viro Road rent

9   209        Check issued by escrow company  123      --

10  209.01     Closing statement of property   67       --
               sale, dated December 15, 1995
11
    227        Report of Richard Lapides       8        --
12
    227.100    Check copies                    8        --
13

14  Plaintiff's:

15  4-B.090    Bank statement of account for  168       --
               Jj & A Architects, Inc. account
16             at Bank of America

17  14         Copy of check to escrow company  73      --

18  014.001    Borrower's closing statement     82      --

19  19         Check written by Robin Johnson   127     --

20  29         Seller final settlement statement 85     --

21  29.001     Closing statement from Design    90      --
               Escrow, dated October 11, 2001
22
    29.002     Escrow documents                128      --
23
    49         Checks                            7      --
24

25

iv

EXHIBITS:  (Cont'd.)

| Plaintiff's: | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 68 | Escrow closing statement for Randy Johnson's loan on the Viro Road property | 132 | -- |
| 69 | Subpoenaed documents from escrow company | 135 | -- |
| 70 | Copy of check for $348,207 | 139 | -- |
| 71 | Short form deed of trust with assignment of rents | 145 | -- |

Defendant's:

| T-35 | Check for $1,067.35 | 121 | -- |
|---|---|---|---|
| T-245 | Check issued by escrow company | 123 | -- |

1

1    SANTA ANA, CALIFORNIA  FRIDAY, FEBRUARY 28, 2014  9:00 AM

2                          --oOo--

3       (Call to order of the Court.)

4            THE COURT:  In the matter of Gonzalez vs. Johnson.

5    Appearances.

6            MR. HINDS:  Good morning, again, your Honor.

7    James Hinds, Hinds and Shankman, LLP, representing Rosendo

8    Gonzalez.

9            MS. KEITH:  Good morning, your Honor.  Christina

10   Keith, Fogle, Keller and Purdy, representing Rosendo

11   Gonzalez.

12           MR. MCCULLOUGH:  Good morning, your Honor.  Burt

13   McCullough representing the Defendants.

14           THE COURT:  Any housekeeping matters?

15           MR. MCCULLOUGH:  Yes.  We would like to introduce

16   into evidence the declaration, trial declaration of Debra

17   Johnson.  And I believe that counsel for the Plaintiff is

18   going to waive any cross-examination.

19           MR. HINDS:  That is true, your Honor.

20           THE COURT:  All right.  So the declaration of

21   Debra Johnson will be admitted subject to the evidentiary

22   rulings.

23           MR. HINDS:  Thank you.

24           MR. MCCULLOUGH:  Thank you.

25           We also, we were speaking with the clerk just a

2

1 few minutes ago about the task of taking down everything

2 we've spent so much time putting up.  It will take a

3 considerable amount of time to take this down, and also to

4 make several trips probably out and back in with all of the

5 books and binders and evidence and that.

6         If we were to stop at 3:30, that would give us an

7 hour and a half and we'd be out by 5:00, and we wouldn't

8 keep anybody past 5:00.  And since we're obviously not going

9 to finish today, I think that'd probably be a reasonable

10 time to conclude.

11         THE COURT:  Okay.  Does this work in one's

12 backyard, too?

13         MR. MCCULLOUGH:  It does.  I have 34

14 grandchildren --

15         THE COURT:  My goodness.

16         MR. MCCULLOUGH:  -- and we put this up outside and

17 we show Disney.  And when they go to bed we put up Phantom

18 of the Opera and the whole neighborhood hears it.

19         THE COURT:  I'm sure that's lovely for those who

20 like the Phantom of the Opera.

21         MR. MCCULLOUGH:  That's right.  So, it comes in

22 handy.  The grand kids love to come to grandpa's house, see

23 the big screen.

24         THE COURT:  All right.  So we'll conclude by 3:30.

25 And, if necessary, we can take slightly shorter breaks

3

1  but --

2           MR. MCCULLOUGH:  I think just normal as we go

3  along.  I have another little problem that at the moment

4  it's under control.  If it gets out of control I'll let the

5  Court know, but I think we'll be okay until then.

6           THE COURT:  Okay.  And just to confirm, we are

7  sticking with the April dates?

8           MR. MCCULLOUGH:  Yes.

9           THE COURT:  April 22nd, half day, and then 23, 24

10 and 25?

11          MR. MCCULLOUGH:  Yes.  And I'm -- now, I think the

12 Court indicated that the 21st might become available.

13          THE COURT:  Well, it's too early to tell.  There's

14 a one-day trial scheduled for that day.

15          MR. MCCULLOUGH:  Well, I was just --

16          THE COURT:  You know, actually, what I will do is,

17 I'll have my law clerk call today, this morning, and see if

18 she can contact the parties for that case because it's a

19 one-day trial.  So -- excuse me.  It would -- if they're

20 willing to move to May, because there's one day open in May

21 on the 30th.  If they're willing to move to May 30th, who

22 knows, it may work better for them, then you can have the

23 21st, also.

24          MR. MCCULLOUGH:  That would -- you know, if they

25 can't move it that's fine.  But if we had that day then I

4

1  feel pretty confident we'd be all through that week.

2       THE COURT:  Okay.  So I'll have my law clerk see

3  if she can contact the parties.  No guarantees on if she'll

4  be able to get a hold of them but we'll try.

5       MR. MCCULLOUGH:  And even if it doesn't open up

6  until, you know, the week before or something, maybe we'll

7  just try to be prepared to go -- come on Monday if the Court

8  calls and says --

9       THE COURT:  Yeah.  The other, the other option,

10  and it's, I guess the lesser desirable of the two, would be

11  to switch them from the 21st to the 25th that week.  I don't

12  know if it makes a difference.  I know there was some

13  concern about traveling.  So I don't know if it helps to

14  start a day early if I can't get them to move from that

15  week.

16       MR. MCCULLOUGH:  Yeah.  Well, it'd be nice to just

17  finish on Friday I think.  And so if they can't move the

18  date to another time, then we'd just keep that schedule.

19  But if they do, fine, we'll just start a day earlier.

20       THE COURT:  All right.

21       MR. HINDS:  Well, if there's a chance of that

22  happening, your Honor, I think we would rather start on the

23  Monday and give up the Friday.  Because we want Mr. Johnson

24  to make the graduation, and we don't want to be too pressed

25  on getting it completed.

5

1        MR. MCCULLOUGH:  Good point.  That would be fine

2  with us.

3        THE COURT:  Okay.  So we'll -- our first choice,

4  we'll see if they can, if they would be willing to move to

5  May 30th.  If not, if they're willing to move to the Friday

6  of that trial week, and then we could start -- even if their

7  trial commences on April 25th, we would be able to start

8  this trial on April 21st.

9        MR. MCCULLOUGH:  That also would probably perhaps

10  be better because then we could come the preceding Friday to

11  set up again.  Otherwise, we'd probably have to set up like

12  Tuesday morning or Monday afternoon maybe.  I don't know.

13        THE COURT:  Yeah.  You know, it probably doesn't

14  matter for that trial if this is there.  So even if they --

15  we can't move it at all, if you want to come in the Friday

16  before and set up that's fine.

17        MR. MCCULLOUGH:  Yeah.  And if they want to use it

18  we won't charge them too much.  Okay.  That sounds --

19        THE COURT:  But we won't tell Ms. Johnson, right?

20        MR. HINDS:  No.

21        MR. MCCULLOUGH:  No.  Nope.

22        MR. HINDS:  She might have charged them more.

23        MR. MCCULLOUGH:  Well, if they want to pay her

24  fee, which is going up every day.

25        THE COURT:  Okay.  Anything else?

6

1          MR. HINDS:  There's no -- that's it.  That's it.

2          THE COURT:  Okay.  Great.  And I think we once

3   again left off with Mr. Lapides.

4          THE CLERK:  Please raise your right hand to be

5   sworn.

6          RICHARD LAPIDES - DEFENDANT'S WITNESS - SWORN

7          THE CLERK:  Please be seated.

8          THE WITNESS:  Your Honor.

9          THE COURT:  Good morning.

10         THE WITNESS:  Yes, good morning.  May I address

11   the Court for just a moment?  Last night mister -- or last

12   night when we were doing the examination, Mr. McCullough

13   said I should go home and try to find some evidence, if I

14   had it, to bring into court the next day.  And that he'd be

15   glad to have me submit it.  And in that case I'd like, in

16   that regard I did find something, and I would like to modify

17   my testimony from yesterday if that's acceptable.

18         MR. MCCULLOUGH:  Well, actually, we didn't ask him

19   to bring it so we could admit it into evidence.  And if it's

20   not on the exhibit list, it's not on the exhibit list then

21   we object.

22         THE WITNESS:  That's fine with me.

23         THE COURT:  Okay.

24         THE WITNESS:  The additional evidence I found --

25         MR. MCCULLOUGH:  Objection, your Honor.  There's

7

1  no question pending.

2          THE WITNESS:  I'll wait.

3          THE COURT:  I assume that whatever information you

4  located you discussed with Mr. Hinds?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  And then we'll -- I'll leave it

7  to Mr. Hinds' judgment as to whether it's something he wants

8  to bring up before the Court or with Mr. McCullough.

9          THE WITNESS:  Am I allowed to modify my testimony

10 from yesterday?

11         THE COURT:  No.  That's what redirect is for.

12     (Pause.)

13                     CROSS EXAMINATION

14 BY MR. MCCULLOUGH:

15 Q   Mr. Lapides, yesterday we were looking at the chart

16 that you prepared on page 100 of your report, which listed a

17 number of checks which you contended showed that Jay Johnson

18 was expending money for work on the Viro Road (phonetic)

19 property.  Do you remember that?

20 A    Yes.  Could you refer me to the exhibit so I can pull

21 it out and put it in front of me?

22 Q   It's exhibit -- well, the checks were in Exhibit 49.  I

23 think that's what you meant.  And it's page 100 of your

24 report.

25 A    Which joint exhibit list -- which joint exhibit is

8

1 that?

2 Q    It -- I'm sorry.  Yes, your report is Exhibit 227.  And

3 so it will be 227.100.  And in that report you refer to

4 Exhibit 49 of your exhibits.  And we had gone through a

5 number of the payees of the checks, and I believe we got

6 down to check number 1962 for $640, payable to Anderson

7 (phonetic).

8 A    One moment, please.

9 Q    Just let me know when you're ready.

10 A    I'm ready.

11 Q    And you also have the -- your copy of the exhibit of

12 the check on page 350 of exhibit, your Exhibit 49?

13 A    Not yet.  Can you tell me the number of the check,

14 please?

15 Q    Nineteen-sixty-two.  It's the third check down on your

16 exhibit with your carrot.

17 A    I have it now.

18 Q    Okay.  This is one of the checks that you indicated Jay

19 Johnson wrote to pay for services rendered on the Viro Road

20 property, is that correct?

21 A    Yes.

22 Q    And to whom is the check payable?

23 A    Anderson.

24 Q    And you cannot read the first name, can you?

25 A    It says "David."

9

1  Q    And are you reading "David" on that or are you

2  referring to a later check that's payable to a David

3  Anderson and just thinking that they're one in the same

4  person?  Because I can't read the name David.  In fact, it

5  doesn't look like David to me.  It looks more like Voyer or

6  something.  Are you guessing as to what the first name is?

7  A    It looks like David.  I'm not absolutely sure.  But it

8  looks like David, but I'm not absolutely sure.

9  Q    All right.  Do you know who that payee is?

10 A    Yes.

11 Q    Who is that?

12 A    He's a contractor who did work on the Viro Road

13 property.

14 Q    Well, now how do you know he did work on Viro Road

15 property?

16 A    Referring to check number 2707, written from the

17 Debtor's personal account.

18 Q    That's one that's a little further down in your list,

19 right?

20 A    Yes.  Referring to check number 2707 from the Debtor's

21 personal account that was written for 746.40 to Anderson

22 Company, and it was noted on the bottom of the check, "deck

23 repairs."

24 Q    All right.  Well, we're going to get to that check in

25 just a minute.  What I'm concerned about is the check for --

10

1  that we're looking at, check number 1962.  It doesn't say

2  Anderson Company, does it?

3  A    No, it says "Anderson."

4  Q    And so, are you just speculating that the Anderson of

5  check 1962 has something to do with the check payable to

6  Anderson Company?

7  A    Yes.  And I -- its consistency.

8  Q    But you don't know, do you?  Do you know more than one

9  person by the name of Anderson?

10 A    No.  Not in this case.

11 Q    Did you ever hear of Craig Anderson?

12 A    No.

13 Q    A very prominent builder in La Canada?

14 A    I didn't hear a question, your Honor.

15 Q    You don't know a Craig Anderson who is a prominent

16 builder and La Canada?

17 A    No.

18 Q    You never heard of the name Anderson, like Wally

19 Anderson?

20 A    No.

21 Q    Blaine Anderson?

22 A    No.

23 Q    All members of the Church of Jesus Christ of Latter Day

24 Saints of which you're a member, and they all live in the La

25 Canada, state, same state you live in, you've never heard of

11

1  the Andersons?

2  A     No.

3  Q     But because we have a check payable to Anderson and a

4  check payable to Anderson Company, they're the same to you,

5  same person?

6  A     In any case, it's the same person, same entity to me.

7  Q     Well, Anderson, is that a person or is that an entity?

8  A     I assume it's both.

9  Q     Both a person and an entity?

10 A     Yes.

11 Q     Well, Anderson Company would indicate that we're

12 talking about a, probably a corporate entity, correct?

13 A     No.

14 Q     Something other than an individual when it's --

15 A     Yes.

16 Q     Okay.  And the -- do you know who runs Anderson

17 Company?

18 A     David Anderson.

19 Q     How do you know?

20 A     Because I see a check made out to Anderson Company, and

21 shortly thereafter a check made out to David Anderson, and

22 another check made out to Anderson.

23 Q     And so you think they're all the same?

24 A     I do.

25 Q     Have you talked to David Anderson?

12

1  A     No.

2  Q     And you say they're located in La Canada?

3  A     I didn't say that, no.

4  Q     Okay.  I thought you said Anderson Company was located

5  in La Canada.  Maybe I'm mistaken.  Where are they located?

6  A     I don't know.

7  Q     A few moments ago you said something about Anderson

8  being a, I thought you said, like a local contractor.  Was I

9  mistaken?

10  A     Yes.

11  Q     What did you say?

12  A     I said Anderson -- a check was written to Anderson

13  Company by the Debtor from his personal account in which the

14  Debtor wrote in the memo section, "deck repairs."

15  Q     Yeah.  I think I had asked you earlier who Anderson

16  was, and I thought you indicated it was a contractor-builder

17  in the La Canada area.  Did you say anything like that?

18  A     I don't recall.

19  Q     Well -- okay.  So, maybe I'm confused.  Let's go back.

20  We're going to talk about check 1962 payable to Anderson.

21  Do you know who that Anderson is?

22  A     Yes.

23  Q     And who is that Anderson?

24  A     It's the Anderson which the Debtors pay checks to

25  concerning the Vernal property.

13

1  Q    Do you know anything more about that Anderson?

2  A    No.

3  Q    Do you know where they're -- do you know where this

4  Anderson of check 1962 is located?

5  A    No.

6  Q    Do you know if he's a contractor?

7  A    I don't know, no.

8  Q    Do you know what kind of business Mr. Anderson is in,

9  or Ms. Anderson or Mrs. Anderson?  We don't know which yet,

10 do we?

11 A    Which question should I answer first?

12 Q    Well, let's go back to check 1962.  Is that -- you're

13 saying that that's the David Anderson, right?

14 A    Yes.

15 Q    Okay.  We'll presume that that's a man.  Do you know

16 where he is located?

17 A    No.

18 Q    Do you know what kind of business he is in?

19 A    Yes.

20 Q    What?

21 A    He does real property work, such as deck repairs, et

22 cetera.

23 Q    Is -- and did you come to that conclusion because you

24 saw another check that said, "Anderson Company," and in the

25 memo line it said, "deck repairs"?

14

1   A    Yes.

2   Q    Is that the only thing you can base your conclusion on

3   that he's involved in doing deck repairs?

4   A    Yes.

5   Q    What does "deck repairs" mean?

6   A    It means he does construction work on real estate.  And

7   the work he does included -- includes work done to decks, et

8   cetera.

9   Q    "Decks, et cetera"?

10  A    Yes.

11  Q    What's the et cetera?

12  A    Very rarely do contractors just work on one item.  And

13  I put that et cetera in there because it's my experience

14  that contractors do work in real estate not just on one

15  specific item, such as decks, they do work on other items

16  involving real estate.

17  Q    And do you know if this Anderson has a contractor's

18  license?

19  A    No.

20  Q    How do you know he's a contractor?

21  A    Because -- I didn't say he was a contractor, I said he

22  does work on Viro Road property.  I know he's a company

23  because the one check is made out to Anderson Company.  And

24  I know he does work on real property because the memo that

25  the Debtor placed on the check says, "deck repairs."

15

1  Q    How do you know this was a deck repair at 4600 Viro

2  Road?

3  A    This was a check written on the Debtor's personal

4  account.  And it's my knowledge from the bankruptcy file

5  that the Debtors own no other real estate that he declared

6  on his bankruptcy filings.

7  Q    He didn't even declare 4600 Viro Road on his bankruptcy

8  forms, did he?  Or are --

9  A    No, he didn't declare it as his property.

10  Q    Did you ever talk to him?

11  A    No.

12  Q    Did you ever go to his office?

13  A    No.

14  Q    Did you ever go to his office?

15  A    No.

16  Q    Did you ever try to contact him?

17  A    No.

18  Q    Didn't try to call him on the phone?

19  A    No.

20  Q    Did you try to find his address?

21  A    No.

22  Q    Did you try to find a telephone number?

23  A    No.

24  Q    So you never got any kind of documentation from him,

25  like a bill or an invoice or a work order, that showed that

16

1 he did work at 4600 Viro Road?

2 A     No.

3 Q     Let's go to the next check, which is at 2368, for $375

4 payable to David K. Arnold Corporation -- Construction.  I'm

5 sorry.

6 A     That's not the next check that's on my list.

7 Q     Well, I think we've already -- I'm sorry.  We haven't

8 talked about that.  Let's go to -- thank you.  I appreciate

9 that.  Let's go to Hickmet (phonetic).  This will be check

10 1429 for $391.65.  I've got the right one now, don't I?

11 A     That's the next one on my list.

12 Q     Good.  I don't want to miss anything on your list.  And

13 let's also take a look at the check which is on page 352 of

14 your exhibits.  And that's the check you're referring to?

15 A     Yes.

16 Q     Who or what is Hickmet?

17 A     "Hickmet" is an individual or a company or entity that

18 does construction work on real estate or home repairs.

19 Q     Now, you said it's either an individual or a company or

20 something else.  It could be a fictitious name then for all

21 you know, right?

22 A     Sure.  Yes.

23 Q     So you don't know who Hickmet is?

24 A     I said it was an individual or entity that does

25 construction work on real estate.

17

1 Q    Well, you're assuming that it's a person or an

2 individual that does real estate work because it says

3 "house" on the memo line?

4 A    No, it says, "house repairs" on the memo line.

5 Q    I'm sorry.  I'm looking at the wrong one.  "House

6 repairs."  What kind of repairs?

7 A    House repairs.

8 Q    Can you be a little more specific?

9 A    A house, meaning a residence, meaning a structure

10 occupied by individual people, and some things in the house

11 break.  Some -- a construction plan goes wrong, and then it

12 requires the assistance of a contractor or individual that

13 can repair something that went wrong in the house or in the

14 construction.

15 Q    You don't know what kind of house repairs this person

16 or this entity did, do you?

17 A    No, not in this instance.

18 Q    Well, I'm only talking about this instance.  Let's stay

19 with this particular instance.  Did you ever talk to Hickmet

20 or somebody from an entity called Hickmet?

21 A    No.

22 Q    Ever try to -- do you know where they're located?

23 A    No.

24 Q    Did you try to find out?

25 A    No.

18

1   Q    You didn't talk to them on the phone?

2   A    No, that wasn't my job.

3   Q    Well, your job was to find out if Jay Johnson was

4   spending money on Viro Road, his own personal money.  And

5   this, that's this part of your report, isn't it?

6   A    Yes.

7   Q    But you didn't bother to find out who Hickmet is, an

8   individual or whatever, and contact them and see if they

9   really did any work on Viro Road, isn't that correct?

10  A    That's correct.

11  Q    All you had was a check that said, "Hickmet," and it

12  says, "house repairs"?

13  A    No, that's not all I had.

14  Q    Well, you haven't -- you didn't speak with him?

15  A    No.

16  Q    And you didn't find out where they were located?

17  A    No.

18  Q    You didn't find out if it was really a contractor?

19  A    No.

20  Q    You didn't search for any -- or ask for any work orders

21  or invoices from Hickmet, whatever that is, correct?

22  A    Invoices were asked -- expenses were asked for by the

23  Trustee, yes, on the Viro Road property.

24  Q    I'm talking about from Hickmet.  You know that, don't

25  you?  We didn't switch gears to what Mr. Gonzalez was asking

19

1  the Johnsons, we're sticking with this check, and you never

2  went to Hickmet, whatever it is or he is, and asked for any

3  documentation to support your conclusion that this person or

4  entity did house repairs at 4600 Viro Road, is that correct?

5  A    I did not do that personally.

6  Q    Well, did you have somebody else do it for you?

7  A    As I said, the Trustee asked for receipts and

8  documentation for any expenses expended on the Viro Road

9  property, and we received nothing.

10 Q    Could that have been because the Johnsons didn't have

11 anything?

12 A    No.

13 Q    Because the Johnsons are liars and perjurers, right?

14 And they're hiding --

15 A    Quite the opposite.

16 Q    -- and they're hiding evidence from the Trustee, right?

17 A    No.

18 Q    Well, then why if they had it wouldn't they have

19 produced it?

20 A    You asked me why.  I believe that.  I believe that

21 because the Johnsons testified that they spent less than

22 $100,000 on the Viro Road property personal expenses --

23 Q    Well, how --

24 A    -- in their 34(b)(2) examination, and I accepted their

25 testimony on its face as truthful.

20

1  Q    And so because of that testimony, if you find a check

2  written to Hickmet which says house repairs, that

3  conclusively proves to you that that was work on the Viro

4  Road property, right?

5  A    That, along with the estimate of the $100,000 that the

6  Debtor made to Trustee.

7  Q    And that conclusively proves to you that Hickmet did

8  work on Viro Road?

9  A    I wouldn't use the word "conclusively," I would use the

10  word "indicates."

11  Q    Well, there's a big difference between conclusively and

12  indicates, right?

13  A    For 100-percent certainty, I don't want to make -- I

14  didn't make those conclusions.  The conclusions I made was

15  as indicated, that these were repairs and spent on the Viro

16  Road property based upon the evidence I reviewed.

17  Q    Well, in your report you seem to be a little bit more

18  specific.  Maybe we could go to the top of this chart here

19  and blow up the part we have outlined there.  Following

20  chart shows some of the additional payments that Jay made

21  for the 4600 Viro Road residence.  That was your conclusion

22  and your opinion, right?

23  A    Yes, that was my conclusion.

24  Q    And your job was as an expert to look at the evidence

25  and come to a conclusion?

21

1  A    My job is to look at all the evidence in its entirety

2  and make a conclusion, yes.

3  Q    Okay.  Let's go to the next one, check 2056 for $1,250,

4  payable to David Anderson.  And is that our same Anderson

5  that we've been talking about just a moment ago?

6  A    Yes.

7  Q    Now let me remind you that at Jay Johnson's deposition

8  on page 121, which we had on the screen.  In fact, maybe we

9  could put that back on the screen, if we could.  It's Jay

10  Johnson's deposition.  And Mr. Hinds was probing Mr. Johnson

11  with questions about this particular matter.  He showed him

12  these checks that we're looking at right here, and he said,

13  "David Anderson, did he do any work on Viro Road or Veral,"

14  and Jay Johnson's answer was, "no."  Do you see that?

15  A    Yes.

16  Q    So, it's your opinion that Mr. Johnson lied under oath

17  to Mr. Hinds, correct?

18  A    It was my opinion that that statement was inconsistent

19  with the evidence that I discovered in my investigation.

20  Q    Well, being inconsistent, that would mean he's lying,

21  right?

22  A    I'm not going to make that judgment.

23  Q    Well, you've made that judgment throughout your report.

24  You're not going to own up to it?

25  A    No, I don't know if he was lying.  I don't know if he

22

1  forgot about it.  If he forgot about it then he wouldn't be

2  lying.

3  Q    And if Mr. David Anderson didn't do any work on the

4  Viro Road property, then your report would be inaccurate in

5  that regard, right?

6  A    Yes.

7  Q    Let's go to the next check, which I guess is Anderson,

8  check 2477 for $1,250.  And that would be on page 354 of

9  your exhibits, correct, with the carrot at the top to

10 indicate it?

11 A    "Three-fifty-four" shows a check to David Anderson.

12 Q    Right.  That's what I said.  That's the one we're

13 talking about, right?

14 A    I see that on page 354.

15 Q    Now this doesn't have anything on the memo line, does

16 it?

17 A    No.

18 Q    Is there anything that indicates that this check for

19 $1,250 was for work performed on Viro Road?

20 A    If you'd give me a moment, I'd like to check the

21 endorsement of the three checks I have for David Anderson,

22 and then I could respond more clearly to your query.

23 Q    Well, wait just a minute.  Are you referring to the

24 exhibits in your book or are you referring to something

25 else?

23

1  A    I'm referring to the exhibits in the book.

2  Q    All right.  So all you have to do is turn the page,

3  right, and you have --

4  A    I would refer to all three of them to see if I could

5  see the payee on the back of the check, if I'm given time to

6  do that.

7  Q    Well, let's -- we're talking about this one particular

8  check.  Just turn the page to page 355.  And you've got your

9  little carrot at the top.  And so we're going to assume that

10 you didn't shuffle the papers up when you got them from the

11 bank, and that the back of that check is there.  Are you at

12 page 355?  I'm not interested in other checks, Mr. Lapides.

13 I want to focus on the one check.  Are you at page 355?

14 A    I was trying to answer your question, and I'm trying to

15 refer to the evidence to answer your question.

16 Q    I want -- you'll get a chance to refer to anything you

17 want when Mr. Hinds gets a hold of you.  I want you to focus

18 on what I'm talking about, please.  I want you to go to 355

19 of your exhibit.  Are you there?

20 A    Yes.

21 Q    And is it your opinion that that is the reverse of the

22 checks that are on the preceding page, 354?

23 A    Yes.

24 Q    And can you read -- say anything about the endorsement

25 on the back of that check?

24

1 A    I see a credit union account referenced.

2 Q    Great.  So it's deposited to a credit union.  Can you

3 read anything else?

4 A    I see a bank in Idaho referenced.

5 Q    A bank in Idaho?  Do you mean to tell me that David

6 Anderson is depositing a check in Idaho for work that he

7 supposedly did on Viro Road in La Canada, California?

8 A    I don't know.  I said I see the imprint on the back of

9 the check referring to the Bank of Idaho.

10 Q    Well, wouldn't that indicate that David Anderson is in

11 Idaho as opposed to California?

12 A    No.

13 Q    He just happens to maintain his account in Idaho but

14 work in California, 1,500 miles away, right?

15 A    I didn't say that.  He could very well have an account

16 at different states.  I don't know.

17 Q    Well, that's an indication of where he's located, isn't

18 it?

19 A    No.  Because the Debtor said he did repairs on his

20 house on the check.

21 Q    On the check that we're looking at, 2056, there isn't

22 any indication of repairs or anything else on that check, is

23 there?

24 A    No.

25 Q    No indication on the check as to what it's for,

25

1  correct?

2  A    Yes.

3  Q    And the back indicates that it's deposited at a credit

4  union in Idaho?

5  A    No.

6  Q    I thought you said you could read credit union on the

7  back?  I mean, I can.

8  A    Yes, I see "credit union."

9  Q    And did you say it says Bank of Idaho down there?

10 A    That's what I said I thought it said.

11 Q    Okay.  Isn't that endorsement the bank's endorsement as

12 to where the check is deposited?

13 A    I don't know.

14 Q    That's right.  You are not a banking expert, are you?

15 A    No.

16 Q    So you don't know what the endorsement means?

17 A    No.

18 Q    I want to make absolutely sure for future reference.

19 When we have that stamp on the back and it indicates a bank,

20 a credit union, some kind of a financial institution as

21 these little numbers and so forth, and indicates the name,

22 like in this case, something Bank of Idaho, you have no idea

23 what that information means?

24 A    Incorrect.

25 Q    Well, then what does it mean?

26

1  A    It means the check was negotiated and paid.

2  Q    Who pays the check?

3  A    Jay and Debra Johnson's account, personal bank account

4  at Citizen's Business Bank.  They pay the check.

5  Q    "Citizen's Business Bank" pays the check?

6  A    Yes.

7  Q    And Citizen's Business Bank on this check is located in

8  La Canada, California, right?

9  A    Yes.

10 Q    It's not located in Idaho, correct?

11 A    Yes.

12 Q    And it's not a credit union?  Citizen's Business Bank

13 is not a --

14 A    I don't think so.

15 Q    Okay.  So, what does the endorsement on the back mean

16 again?  It obviously doesn't mean that they paid the check,

17 because we've just identified Citizen's Business Bank as

18 paying the check, right?

19         MR. HINDS:  Objection, compound and --

20         MR. MCCULLOUGH:  We'll withdraw the question.

21 BY MR. MCCULLOUGH:

22 Q    We've established the check is paid by the Johnsons'

23 bank, Citizen's Business Bank in La Canada, correct?

24 A    Yes.

25 Q    And what I want to know is, the endorsement on the

27

1  back, what does that indicate?

2          MR. HINDS:  Objection.  It has been asked and

3  answered and the witness has given his best testimony.

4          MR. MCCULLOUGH:  Well, he's been -- a little

5  clarification.

6          THE COURT:  Overruled.  He may answer.

7          MR. MCCULLOUGH:  Thank you.

8          THE WITNESS:  It means it was negotiated and paid.

9  BY MR. MCCULLOUGH:

10  Q    Let me ask you.  Do you know what the word,

11  "negotiation" means?

12  A    A general idea.  I have a general idea.

13  Q    Give me your general idea.

14  A    The general idea is the Debtors, Jay and Debra Johnson,

15  have money in an account at Citizen's Business Bank located

16  in La Canada.  He wrote -- he writes a check and signs it,

17  and ultimately that when it's negotiated, that $1,250 is

18  taken from Jay Johnson's account and placed in David

19  Anderson's account.  That's what I mean by negotiate.

20  Q    Do you know if there are any requirements for a check

21  to be negotiated?

22  A    No.

23  Q    So, for example, in this case, if the check is payable

24  to David Anderson, do you know if David Anderson has to

25  endorse the check for it to be negotiated?

28

1  A     No.

2  Q     Did you try to locate a David Anderson in Idaho?

3  A     No.

4  Q     Go to the next check.  This is check 2477 for another

5  $1,250 payable to just Anderson.  And we find that check on

6  page 356 of your Exhibit 49, is that correct?

7  A     Yes.

8  Q     And just opposite the face of the check we see,

9  presumably, a picture of the back of the check, correct?

10 A     Yes.

11 Q     And can you read the endorsement on the back of this

12 check?

13 A     To the account of 8699, the within named payee, a

14 credit union -- I can't read the next section, and Rexburg,

15 Idaho under that.  It says no --

16 Q     Well, no.  Let's stop right there.  That's the

17 endorsement, the payee's -- well, that's the endorsement for

18 the payee, isn't it?

19 A     There's four more stamps on the back of the check.

20 Q     Well, I don't want to go to the other stamps for the

21 moment.  We're just looking at the top one that you were

22 referring to, and it says, "credited to the account of

23 8699," correct?

24 A     I can't make out of the first word.

25 Q     Okay.  Well, it's a very standard thing on any bank's

29

1 stamp for endorsement, credited to the account of.  But

2 you're not a banking expert so we won't worry about that.

3     But then it says, you know, credited to the account of,

4 and then it says, "the within named payee."  What does that

5 phrase mean, do you know, even though you're not a banking

6 expert?

7 A    Anderson is my -- I would know to conclude that it

8 refers somehow to some relationship to Anderson.

9 Q    Okay, wait a minute.  The within named payee of the

10 check is David Anderson, the payee named on the front of the

11 check, is that your conclusion?

12 A    Yes.

13 Q    Good.  Then it says, "Beehive Federal Credit Union."

14 You didn't read the Beehive.  Maybe you couldn't read that.

15 But Beehive Credit Union, Rexburg, Idaho, correct?

16 A    I see "Federal Credit Union, Rexburg, Idaho."  Yes,

17 correct.

18 Q    Okay.  Would that be an indication, if nothing else,

19 that this check was deposited to the be -- to an account of

20 the within named payee at the Beehive Federal Credit Union

21 in Rexburg, Idaho?

22 A    I don't know.  There's four stamps on the back of the

23 check, so I would answer, I don't know.

24 Q    Well, you're here testifying that Jay Johnson wrote a

25 check out to this David Anderson for work done on the 4600

30

1 Viro Road property in La Canada, California.  And it appears

2 to most of us that the check is being deposited at the

3 Beehive Federal Credit Union in Rexburg, Idaho.  If you're

4 going to render the opinion you are, don't you need to know

5 something about what you're talking about?

6 A    Yes.

7 Q    Well, did you ask anybody what that endorsement stamp

8 means, "credited to the account of the within named payee,

9 Beehive Credit Union, Rexburg, Idaho"?

10 A    No, that wasn't significant in my opinion.

11 Q    Would it be significant if you're trying to establish

12 that Jay paid somebody for working on the Viro Road property

13 in California, as to whether that person lived in California

14 or lived in Idaho?

15 A    It could be.

16 Q    Well, let's explore that for a minute.  If Jay is

17 hiring local contractors and repairmen and things like that

18 to do work on the Viro Road property, that would be an

19 indication perhaps that since they're local and around

20 there, that those would be people he might hire, right?

21 A    Yes.

22 Q    And if we're identifying people who live in, you know,

23 1,500 miles away in Idaho or where ever, that would be an

24 indication that maybe they didn't do any work on Viro Road,

25 right?

31

1  A     Possibly.  Possibly not.

2  Q     Would it be fair to say, you don't know?

3  A     No.

4  Q     So you do know?

5  A     I have an indication of the answer.

6  Q     All right.  Let's go -- let's see.  Let's go to the

7  next check, 2368 for $375, payable to David K. Arnold

8  Construction.  And that's on the next page of your exhibit,

9  page 357.  Do you have that?

10 A     Yes.

11 Q     Do you know who David K. Arnold Construction is?

12 A     My indication was that it was a construction company.

13 Q     And was that because of the work "construction" in the

14 name of the payee?

15 A     Yes.

16 Q     Is there any other information that you have that David

17 K. Arnold is involved in the construction industry?

18 A     No -- what -- no.

19 Q     Okay.  Did you ever talk to anybody from David K.

20 Arnold Construction?

21 A     No.

22 Q     Do you know where they're located?

23 A     No.

24 Q     Do you ever contact them by telephone?

25 A     No.

32

1  Q     Have you ever looked up their telephone number?

2  A     No.

3  Q     Do you know if they're local in La Canada?

4  A     No.

5  Q     Do you know if they're in Idaho?

6  A     No.

7  Q     You have no idea where David K. Arnold Construction is

8  located, is that correct?

9  A     Not exactly.

10 Q     Well, I guess the first thing is you're saying, you

11 don't know really where they're located, is that right?

12 A     I have an indication where they're located.

13 Q     And what is that indication?

14 A     The indication is, they were doing work around the La

15 Canada area because the Debtor wrote the check out to him

16 from his La Canada address.

17 Q     Do you ever write out a check for services or goods

18 purchased out of state?

19 A     No, I don't think I have.

20 Q     Have you heard of that thing being done?

21 A     It's entirely possible.  It's entirely possible.  I'm

22 not saying it couldn't be done.

23 Q     Well, won't you give a little bit and say, yes, it is

24 something that is done?

25 A     I can't think of an example right now where it's done,

33

1  but --

2  Q    We live in the world of the internet, don't we?

3  A    Yes.

4  Q    Don't we buy goods all over the country over the

5  internet?

6  A    Yes.

7  Q    Don't we buy things through mail order houses?

8  A    Yes.

9  Q    Isn't it really common that people write out checks all

10  the time and send them out of state?

11  A    I don't, I don't think so.  I've never done that.

12  Q    Really?  Pay your taxes?

13  A    Yes.

14  Q    Where do you send your check for your taxes?  How about

15  Ogden, Utah?

16  A    That's possible.

17  Q    A lot of things are possible.  Isn't that the place

18  where we here in Southern California send our taxes is to

19  Ogden, Utah.  Isn't that the I.R.S. center there?  You work

20  for the I.R.S., you ought to know that.  So you in fact do

21  send checks, write out checks and send them out of state for

22  some reason on occasion, don't you?

23  A    No, I can't recall ever having done that.

24  Q    Okay.  You never went to the David K. Arnold and tried

25  to find any documentation with respect to the work that you

34

1 claim was done on the Viro Road property, is that correct?

2 A    Yes.

3 Q    And you never spoke with anybody from David K. Arnold

4 Construction to see if they ever did any work on the Viro

5 Road property, is that correct?

6 A    Yes.

7 Q    Okay.  The next check is to Hickmet, and let's just

8 take a quick look at it.  Check 2477.  I'm sorry, 2521.

9 Thank you.  It's on the next page of your exhibit, page 358.

10 It's just payable to Hickmet, right?

11 A    Yes.

12 Q    And in this case, there's nothing in the memo line, is

13 there?

14 A    No.

15 Q    Whereas in the Hickmet check before, it said, "house

16 repairs," right?

17 A    Yes.

18 Q    So in this case, you don't know what this check was

19 issued for, do you?

20 A    I wouldn't say that, no.

21 Q    It just falls in the same category as all the checks,

22 in your opinion, that's for work performed on the Viro Road

23 property.  This because Jay said he spent so much money on

24 the property, right?

25 A    That, in addition to the fact that the Debtors wrote a

35

1 personal check out to Hickmet and labeled it for "house

2 repairs" on 2-7 -- 2000.

3 Q    Let's go to the next check, 2707, which is on the next

4 page of your exhibit.  It's page 359.  That's just another

5 one of our Anderson checks?  In fact, I think this is the

6 one you kept referring to about the deck repairs, right?

7 A    Yes.

8 Q    If we go to the next check, 2708, again, to Hickmet, it

9 has a -- well, let's first find it.  It's on the next page,

10 page 360 of your exhibit, correct?

11 A    Yes.

12 Q    The memo line on this check says what?

13 A    "Balance repairs in bill."

14 Q    All right.  I'm looking at this carefully.  The first

15 word you say means -- reads "balance"?

16 A    Yes.

17 Q    And underneath that I -- it looks like maybe the word

18 "repairs"?

19 A    Yes.

20 Q    And after the word "balance," what do you think that

21 means?  What is that?

22 A    "In bill.  Balance repairs in bill."

23 Q    Well, we have the word, "balance."  And then underneath

24 it the word, "repairs," correct?

25 A    Yes.

36

1  Q    But following the word "balance," there's something

2  written there.  What is that?  You're saying that means

3  bill?

4  A    "In," I-N.

5  Q    Balance in bill?

6  A    Yes.

7  Q    All right.  We'll take your interpretation for the

8  moment I guess.  Well, if you can read it, your eyes are

9  good, too.

10     Now, what business is Jay in, Jay Johnson?

11 A    Per his deposition testimony, he says he's a developer

12 of real estate, where he buys, improves and sells real

13 estate, and an architect.

14 Q    And you've known him for many, many years, correct?

15 A    Yes.

16 Q    And you've known he's been involved in that business

17 for many years, correct?

18 A    Yes.

19 Q    In fact, you've even participated with him in some

20 projects, correct?

21 A    Yes.

22 Q    And isn't it true that Mr. Johnson has many clients?

23 A    I think so.

24 Q    And he has many projects that he works on?

25 A    I think so.

37

1  Q    And he's done that for many years?

2  A    Yes.

3  Q    And that would include the years, say, 1995 to 2005?

4  A    Yes.

5  Q    And isn't it true that Mr. Johnson uses some of the

6  same contractors and subcontractors and so forth on more

7  than one job?

8  A    I don't know.

9  Q    Well, let's go back to Mr. Johnson's deposition.  If we

10  could put that up, page 119.  And if we could highlight the

11  middle portion, please.  This was the portion where Mr.

12  Hinds asked Jay Johnson, he says, "can you see who the payee

13  is," and showed him one of the checks we've looked at, and

14  Mr. Johnson identified it as David Paynter (phonetic).

15      Then Mr. Hinds asked the question, "and do you know why

16  you would write -- why you have written a check to Dave

17  Paynter in 1997?"  And Jay answered, "I'm not sure because

18  he did a lot of projects for myself and clients."  Then he

19  asked the follow-up question, there's no way to tell whether

20  this was on the Viro Road property?"  And Jay said, "no."

21      Now, isn't it true that David Paynter and other

22  contractors do work on various and sundry jobs that Mr.

23  Johnson has?

24  A    I know for a fact David Paynter did work on the Viro

25  Road property.  I do not know for a fact that he did work on

38

1  other properties.

2  Q    Let's see.  How many checks did you go through for

3  Jay's business A.i.a?

4  A    Many.

5  Q    And were the only checks you saw to David Paynter the

6  ones that you've identified here as paying him for doing

7  work on what, you say, Viro Road?

8  A    No, there were not all.

9  Q    So there were other checks payable to David Paynter?

10 A    No, I didn't say that.

11 Q    Well, I thought that was my question.  When you went

12 through all the checks, you saw several checks payable to

13 David Paynter, correct?

14 A    Yes.

15 Q    And you saw checks payable to David Paynter that are

16 not in the list that you've got here on page 100 of your

17 report, right?

18 A    I saw other payments to David Paynter by the Debtor,

19 Jay Johnson, for work on Viro Road property.

20 Q    The -- did you list every check that you saw payable to

21 David Paynter in your list here on page 100 of your report?

22 A    No.

23 Q    So does that mean that there were other checks payable

24 to David Paynter that you did not list on this list?

25 A    I don't know.

39

1 Q    Well, did you or did you not find other checks payable

2 to David Paynter that are not listed on your exhibit here on

3 page 100?

4 A    I have other evidence that the Debtor paid David

5 Paynter for work on Viro Road property.

6 Q    That wasn't my question.  Please listen to my question.

7 You've indicated that you went through probably thousands of

8 checks for A.i.a, correct?

9 A    No.

10 Q    Hundreds?

11 A    Quite possibly.

12 Q    And in going through those checks, you found some

13 checks payable to David Paynter?

14 A    Yes.

15 Q    And some of those checks you listed here on your page

16 100, correct?

17 A    Yes.

18 Q    Does that mean that there were some checks that you saw

19 payable to David Paynter that are not listed on page 100?

20 A    Probably, yes.

21 Q    All right.  Would that indicate to you as an expert

22 trying to ferret out fraud, that David Paynter was being

23 paid for work on projects other than Viro Road?

24 A    No, I have -- if you wanted certainty, I could say that

25 David Paynter did work on the Viro Road property.  I have

40

1  the evidence.  And I don't know about any other projects he

2  did work on.  But I do know for a fact that he did work on

3  the Viro Road property.

4  Q    Well, that's not in dispute.  We all know that.  The

5  question that I'm asking you is, these other checks that you

6  have not listed, did they indicate that David Paynter was

7  doing work on other projects, other than Viro Road, for

8  which Jay was paying him?

9  A    No.  It indicated Viro Road property for the work he

10 did for the Debtor.

11 Q    The why did you not list all the checks to David

12 Paynter and say that they were all for the Viro Road

13 property?

14 A    The reason is Jay Johnson -- we had a letter that Jay

15 Johnson wrote acknowledging that he paid David Paynter

16 $20,000 for work on the Viro Road property.  That's included

17 as an exhibit attached in this Exhibit 49, which you skipped

18 over in your questions to me.

19 Q    Well, we haven't got that far perhaps.  But are you

20 sure that the letter says he paid David Paynter $20,000?

21 A    Yes.

22 Q    It didn't say he traded services with David Paynter?

23 A    That's the same thing.

24 Q    Okay.  I'm happy to hear that.  All right.  But it did

25 say traded services instead of paid, right, or are you

41

1  mistaken again?

2  A    What's the question?  I was confused by your two parts.

3  Q    The letter that you just referred to, did it say, did

4  Jay Johnson say in the letter that he paid David Paynter or

5  that he traded services with David Paynter?

6  A    If you give me a moment I'll refer to the Exhibit 49 to

7  see what it says.

8  Q    Sure.

9  A    I found it.

10  Q    And where is it that you're looking?

11  A    Page 323 of Exhibit, in my report, 49.  Page 323.

12  Q    All right.

13        THE COURT:  I'm sorry, Mr. Lapides.  What was the

14  page number again?

15        MR. MCCULLOUGH:  Three-twenty-three.

16        THE WITNESS:  In the joint exhibit list --

17        THE COURT:  Three -- the number you just gave.

18        THE WITNESS:  Three-two-three.

19        THE COURT:  "Three-two-three."  Thanks.

20        MR. MCCULLOUGH:  What number did he just give you,

21  your Honor?

22        THE COURT:  Three-two-three.  Is that correct?

23        MR. MCCULLOUGH:  That is correct, yeah.

24        THE WITNESS:  Yes.

25        THE WITNESS:  In Exhibit 49.

*Briggs Reporting Company, Inc.*

42

1  BY MR. MCCULLOUGH:

2  Q    You were going to tell me what the letter said.

3  A    The letter was a letter written by the Debtor, Jay

4  Johnson, to Downey Savings and Loan regarding the Viro Road

5  property.  And in that letter Jay acknowledges that he paid

6  a total of $60,950 towards the Viro Road property

7  construction expenses.

8  Q    I think the question was, whether he said he paid David

9  Paynter or traded services with David Paynter.  I don't want

10 you to change it around and volunteer other information.

11          MR. MCCULLOUGH:  I'll ask the Court to strike the

12 answer.

13          THE COURT:  Stricken.

14 BY MR. MCCULLOUGH:

15 Q    What does the letter say about the services that David

16 Paynter rendered and how Jay paid or traded services for it.

17 What does the letter say?

18 A    That Jay did work amounting to $61,000 in return for

19 the $61,000 work done on the Viro Road property.

20 Q    All done by David Paynter?

21 A    No.

22 Q    Well, please concentrate on the question that I asked.

23 Let's just read the letter.  It says, "enclosed are

24 statements from the general contract" -- well, it says,

25 constructor.

43

1          "Enclosed are statements from the

2          general constructor, David Paynter,

3          about the additional costs the Johnsons

4          expended..."

5     By the way, who -- what Johnsons is he talking about

6 here?

7 A     I'm not sure.  It could be Randy, it could be Jay.

8 Q     Who's he writing this letter to?

9 A     Ms. Janice Schriff (phonetic), Downey Savings and Loan.

10 Q     All right.  And what was going on with Downey Savings

11 and Loan for which this letter was being written?

12 A     The Debtor was trying -- assist in getting a, as I

13 remember, a $620,000 loan on the Viro Road property.

14 Q     Okay.  You say "assisting."  Who was he assisting?

15 A     The -- his brother whose the property was titled in the

16 name of.

17 Q     Okay.  So, Jay is writing a letter to Downey Savings to

18 help Randy Johnson get a loan on the property, correct?

19 A     To help get a loan on the property is the way I would

20 phrase it.

21 Q     Okay.  And so when Jay says, "enclosed is statements

22 from the general constructor, David Paynter, about the

23 additional costs the Johnsons expended on their project,"

24 it's pretty clear, isn't it, that he's talking about Randy

25 and Robin Johnson and not Jay and Debbie Johnson?

44

1  A    No.  It could be, but it's not clear.

2  Q    Not clear to you obviously, is that right?

3  A    Yes.

4          MR. HINDS:  Argumentative.

5          THE COURT:  Sustained.

6  BY MR. MCCULLOUGH:

7  Q    Wouldn't he have more likely said if he's talking about

8  himself, about the additional cost we extended -- expended

9  on our project?

10          MR. HINDS:  Objection, speculation.

11          THE COURT:  Sustained.

12  BY MR. MCCULLOUGH:

13  Q    Well, going on it says, "and that $20,000 of his fee

14  was traded."  Traded.  Did you see the word "traded" in

15  there?

16  A    Yes.

17  Q    It didn't say paid, did it?

18  A    No.

19  Q    It said traded?

20  A    Yes.

21  Q    And you're not afraid to tell us that now that it was

22  traded, right?

23          MR. HINDS:  Objection, argumentative.

24          THE COURT:  Sustained.

25  //

45

1 BY MR. MCCULLOUGH:

2 Q    And a minute ago, he said something about $61,000, was

3 it?

4 A    Sixty-thousand-nine-hundred-and-fifty dollars.

5 Q    Now where on this letter do you come up with that

6 figure?

7 A    I added together the total numerical numbers of work

8 that was done on the Viro Road property by contractors,

9 where the Debtor did work for those individuals in lieu of

10 payment totaling the $60,950.

11 Q    Now, you --

12 A    Should I break down the number for you?

13 Q    No.  I want you to -- I thought we were talking about

14 this letter, December 16th, and you said something about the

15 60,000- or $61,000.  I don't see that in this letter.

16 A    Yes, it's in this letter.

17 Q    Well, it talks about the $20,000 fee for David Paynter

18 which he traded, right?

19 A    Yes.

20 Q    It talks about $13,000 worth of landscaping, which was

21 traded with Dave Zoleska (phonetic), right?

22 A    Yes.

23 Q    Well, Dave Zoleska's not David Paynter, is he?

24 A    No.  No, of course not.

25 Q    Okay.  And it's not construction work, it's landscaping

46

1  work, right?

2  A    Yes.

3  Q    And then you say, "this was in addition to the cost

4  allocated for landscaping by the bank," correct, it says

5  that in the second paragraph?

6  A    Yes.

7  Q    And then we go to the third paragraph and it says, "the

8  architectural fees of $21,000 were traded with me, Jay

9  Johnson, right, Randal's brother, right?

10  A    Yes.

11  Q    And Jay Johnson's about the same as David Paynter?

12  A    No, of course not.

13  Q    And then he says, "also, the Johnsons."  And what

14  Johnsons is Jay referring to there?

15  A    Himself.

16  Q    "Himself"?  He says, "also, the Johnsons paid for the

17  building permits directly."

18  A    Yes.

19  Q    He's referring to himself there?

20  A    Yes.

21  Q    You're kidding me?  Okay.  That's how you interpret it.

22  All right.  "Also, the Johnsons paid for the building

23  permits directly, a funded item of $6,800."  And so it's

24  your testimony that that means that Jay is saying that he,

25  Jay Johnson, paid the building permits?

47

1  A    Yes.  Based upon this and the letter right before this

2  letter on the previous page of my exhibits.

3  Q    And then he says, "in summary, the following additional

4  project costs were funded outside the construction," and

5  then he had, gets him up to 106,000.  Where does the $60,000

6  come in?  How do you add up any of these numbers to come up

7  with the number you came up.  What was your number, 61,950?

8  A    Yes -- no, 60,950.

9  Q    "Sixty-thousand-nine-hundred-and-fifty.  Is there any

10  permutation of the numbers on this letter that add up to

11  $60,950?

12  A    Yes.

13  Q    What numbers were you adding?

14  A    On the previous page, 322 --

15  Q    No, no, no.  I'm talking about this page.  Don't go to

16  another page, please.

17  A    They're both -- I considered them both together.

18  Q    Isn't it possible that Jay Johnson was writing out some

19  of these checks to these contractors and that for jobs other

20  than on Viro Road?

21        MR. HINDS:  Objection, calls for speculation.

22        THE COURT:  Overruled.

23        You may answer.

24        THE WITNESS:  No.  He specifically states that

25  this was for Viro Road in that letter.

48

1  BY MR. MCCULLOUGH:

2  Q    I'm sorry and I apologize.  I'm going back to the list

3  of checks on page 100 of your report, in which you list all

4  these checks payable to Anderson and Hickmet and so forth.

5  I'm back there, okay?

6  A    Okay.

7  Q    All right.  Isn't it possible that Jay was writing out

8  some of these checks to these people for work that was

9  performed on jobs other than Viro Road?

10 A    Anything's possible but that's not my opinion.

11 Q    And -- well.  So it is possible that these checks could

12 have been written out for jobs other than Viro Road?

13 A    Not very likely.

14 Q    But still possible?

15 A    Yes.  Anything's possible.

16 Q    Okay.  So, if you're saying that some of them could

17 possibly be for jobs other than Viro Road, then it would be

18 speculation on your part that they are all just for Viro

19 Road, right?

20 A    No.  If I could -- no.  Some of these are definitely

21 for Viro Road property.  Without a shadow of a doubt, 100-

22 percent sure, some of these payments are on Viro Road

23 property.  I know that for a fact.

24 Q    When -- okay.  Let's stop right there.

25 A    Some I'm not sure of.

*Briggs Reporting Company, Inc.*

49

1  Q    Okay.  Some you're absolutely, positively sure that

2  they, as a matter of fact, were for Viro Road?

3  A    Yes.

4  Q    Okay.  Let's just stop right there.  And your testimony

5  is not based on personal knowledge, is it?

6  A    Yes.  Yes, it based on my knowledge, what I heard the

7  Debtor say.

8  Q    Well, you heard the Debtor say they spent money on Viro

9  Road, right?

10  A    That was part of what I heard.

11  Q    You did not remember a conversation or hearing Jay

12  Johnson say that any one of these particular checks was in

13  fact spent for Viro Road?

14  A    Yes, I do remember him specifically saying it was

15  specifically spent for Viro Road property.

16  Q    One of these checks here?

17  A    Yes.

18  Q    Which one?

19  A    Going from the bottom up, $1,808.  The next one is

20  1,458.13.  The next one is $1,000, and the next one is

21  $1,000.  And going up further, it's $20,000 to Paynter,

22  13,150 to West Coast, and $21,000 to Architectural Services.

23  These are the ones I'm absolutely sure of based upon the

24  Debtor admitting that these were paid for the Viro Road

25  property.

50

1  Q    Well, as to the $21,000 at the top for Architectural

2  Services, that's Jay, isn't it?

3  A    Yes.

4  Q    Okay.  And the landscaping for the $13,000, that was

5  traded for services with Jay, right?

6  A    Yes.  Jay did work for West Coast Nursery that he

7  didn't get money for, that was done on Viro Road property.

8  Q    He got money for it?

9  A    No.  I said, Jay -- I was saying, West Coast Nursery

10 did $13,150 of work on a Viro Road property.  And in lieu of

11 getting payment, Jay did $13,151 of architectural work, I'm

12 assuming, for West Coast Nursery for which he did not

13 receive a payment which he would otherwise have been paid

14 for.

15 Q    Okay.  And the $20,000 construction for David Paynter,

16 that was also traded for services, as opposed to being paid,

17 right?

18 A    Yes.

19 Q    Okay.  Then in between there, the Paynter Construction

20 check for $4,500, going down to the check to Hickmet

21 labeled, "balance repairs," just before Sinka Printing

22 (phonetic), that set of checks, you do not know for a fact

23 were written for work performed on Viro Road, is that

24 correct?

25 A    Not exactly.  I have a 95-percent degree of certainty

*Briggs Reporting Company, Inc.*

51

1  on many checks.  I have less the degree of certainty on

2  other checks.

3  Q    So there are some checks that you just don't know?

4  A    Well, there's $76,937.83 which I'm, I could give you,

5  I'm certain to a very high degree of certainty that those

6  checks went towards the Viro Road property.  The other

7  checks outside of the $76,937.83 I have a less degree of

8  certainty about.

9  Q    Okay.  And the ones that you have less certainty about

10 are the ones starting with Paynter Construction for 4,500

11 and going down to Hickmet for the 283.65, right?

12 A    No.

13 Q    There are some checks in between there that you're

14 absolutely, positive were paid for Viro Road?

15 A    I said, I have a 95-percent confidence in that they

16 were.

17 Q    All right.  And so, that then leaves some checks that

18 you don't know about, right?

19 A    Some checks I'm less certain about and cannot make a

20 definitive statement they were absolutely for Viro.  Yes,

21 that's correct.

22 Q    Let's go to the next page of your report 227, page 101.

23 That's Exhibit 227, page 101.  And at the top of that page

24 you say:

25              "The following chart shows some of

52

```
 1            the additional payments that Debtor, Jay

 2            Johnson, made for the 4600 Viro Road

 3            residence for interior design work.  The

 4            property owner typically pays for these

 5            expenses."

 6       Are you an expert on what owners typically pay for in

 7  the way of interior design for houses that they rent out?

 8  A    Yes.

 9  Q    How many houses have you owned that you've rented out

10  in which you had interior design work done on?

11  A    More than 10 that I could recall right now.  I'd have

12  to go back and refresh my recollection, but more than 10.

13  Q    Okay.  So you've had at least 10 homes on which you

14  owned the property and leased out the home?

15  A    Yes.

16  Q    And in those homes did you do -- did you pay for the

17  interior design of the homes, interior decorating of the

18  homes?

19  A    Yes, I did.

20  Q    And did you let the tenants pick out what they wanted

21  to do regardless of cost?

22  A    No.

23  Q    And does that make you an expert on the subject?  Was

24  that just your personal experience?

25  A    I have a lot of experience on this subject and --
```

*Briggs Reporting Company, Inc.*

53

1  Q    Well, okay.

2  A    -- a lot of knowledge on the subject.

3  Q    Well, you've had your own experience.  Have you ever

4  gone to school and learned about what owners of properties

5  do in the way of providing interior design services for --

6  A    Yes.

7  Q    What school was that?

8  A    I've been trained in real property issues from my

9  employer, the Department of the Treasury.  For the last 35

10 years I've gone to numerous classes where they talk about

11 income and expenses.  And I've done that for the last 36- or

12 seven years.  And I've been trained in that by my employer.

13 Q    Well, when you say "trained" by your employer, can you

14 explain to me what training you received with respect to an

15 owner of property paying for interior design of homes that

16 are let out for rent?

17 A    I believe that was covered in classes called SREA 101,

18 SREA 102, AIRE 201, ARE 202, ARE -- I can't remember the

19 number of the other class.

20 Q    You have quite a memory there about the class numbers.

21 But the question was, what training did you receive in this

22 subject?

23 A    We discussed income and expenses which were proper and

24 appropriate.

25 Q    For what purpose?

*Briggs Reporting Company, Inc.*

54

1  A    For determining if there was an inconsistencies with

2  the returns and the truth.

3  Q    So those were with respect to taxing issues?

4  A    Yes, taxing estate and gift, exempt organizations,

5  personal, individual tax returns as well.

6  Q    But we're not involved with those kinds of issues in

7  this case, are we?

8  A    We absolutely are, yes.

9  Q    Is -- are we going to try to determine in this case

10 whether or not there was tax fraud?  That's not an issue in

11 this case, is it?

12 A    I don't believe that's an issue before this Court at

13 this time.  I'm not sure.

14 Q    And so --

15 A    I'm not sure of that actually.  I'm not sure what the

16 Court decides and doesn't decide.  I don't think it is.

17 Q    But you were not hired to do a tax audit of the

18 Johnsons, were you?

19 A    No.

20 Q    That's a job that the I.R.S. hires you to do?

21 A    Yes.

22 Q    And, in fact, do you do tax audits?

23 A    I do -- I call them -- I do examinations.  And I do

24 forensic analysis.

25 Q    Okay.

55

1  A     And that's what I'm hired to do.

2  Q     All right.  You're job is as a real estate appraisal

3  reviewer, correct?

4  A     I'm a real estate specialist.  I think you would -- is

5  the classification.

6  Q     Well, isn't your job that of a real estate appraiser, a

7  real estate appraisal reviewer?

8  A     No.  Not -- you mean that that's entirely -- it's not

9  entirely my job, no.

10  Q     Well, let's take a look at page 101 here and the checks

11  that you have listed.

12          MR. MCCULLOUGH:  And so, do you want to just close

13  that down, that part, and blow up the top chart.  Yeah.

14  BY MR. MCCULLOUGH:

15  Q     All right.  So, it's your testimony that the checks you

16  have listed here totaling a little more than $9,000, were

17  checks that Jay wrote for interior design work on Viro Road,

18  correct?

19  A     Correct.  Yes.

20  Q     And it's your opinion that this type of work is work

21  that would be done for -- paid for my the owner as opposed

22  to the tenant?

23  A     Yes.  I've never seen it paid for by a tenant before in

24  my career.

25  Q     Well, okay.  It doesn't mean that tenants don't pay for

56

1  it though, does it?

2  A    Like I said before, I think anything is possible.

3  Q    Well, if a tenant wants to hang a little curtain in the

4  bathroom, is that something that a tenant might do?

5  A    Sure.

6  Q    And if a tenant wants to entirely redecorate a mansion

7  in La Canada with new drapes and painting the house and

8  whatever else comes along in the way of decorating, that

9  they should just call up the landlord and say, this is what

10 we want to do and you've got to pay for it?

11 A    That's not how it works.  I didn't say that's how it

12 works.

13 Q    Well, we know from -- at least we think we know from

14 your chart here, that there's over $9,000 worth of interior

15 design done in a house, right?

16 A    Yes.

17 Q    All right.  Do you have an opinion as to whether or not

18 a -- if a tenant called up a landlord when he's renting a

19 house and said, I've got $9,000 worth of interior design I

20 want done in here.  The landlord would say, all right, go

21 right ahead.  I'll pay for it.

22 A    That hypothetical --

23          THE COURT:  I'm sorry.  Was there a question?

24          MR. MCCULLOUGH:  Yeah.  I asked him if he had an

25 opinion, that if the tenant called the landlord and said, I

57

1  want to do $9,000 worth of work and I want you to pay for

2  it.

3  BY MR. MCCULLOUGH:

4  Q    Do you have an opinion as to whether or not the owner

5  would do it?

6  A    My thing is your hypothetical is unrealistic.

7  Q    Well, we're talking about $9,000 of interior design

8  work here, aren't we?

9  A    Yes.

10 Q    All right.  My hypothetical is, if a tenant calls up

11 the owner and says, I have $9,000 worth of interior design

12 work I want done, and I want you to pay for it, Mr. Owner.

13 Do you have an opinion as to whether the owner would or

14 would not say, sure, go ahead?

15 A    That doesn't -- my opinion is that you're proposal, a

16 hypothetical, never happens.  I've never seen that happen in

17 the real world.

18 Q    Could that be because no tenant knows that -- a tenant

19 knows that no owner is going to do that?

20 A    You're misstating what I'm, the point I'm making in my

21 report.

22 Q    Well, just answer the question.

23        THE COURT:  Again, Mr. Lapides, I need to remind

24 you that you need to answer the questions.

25 //

58

BY MR. MCCULLOUGH:

Q    I'm waiting for an answer.

A    Could you repeat the question?

Q    Probably not.  Let's see if we can try it again.  If a tenant called up the owner of the property that he was renting and said, I have $9,000 worth of interior design work I want to do, and I want you to pay for it.  Do you have an opinion as to whether the owner would say, sure, go ahead and do it?

A    Yes.

Q    And what is that opinion?

A    My opinion is the owner would probably say, no.

Q    So in this case, if Jay was renting the property for Randy, and he called up Randy and said, hey, Randy, I've got $9,000 worth of interior design work I want to do here, but I want you to pay for it.  Randy would say, no, right?  That would be your opinion, right?

A    You're -- you began the query with, in this case between Randy and Jay.  And my response to your question would be, a tenant typically never pays these expenses, and the owner pays these expenses, in response to your question.

Q    Well, that wasn't in response to my question.  My question followed directly upon the heels of a prior question in which you gave an answer.  I asked you if you had an opinion, and you said, yes.  And I asked you what

59

1  your opinion was.  And you said, no.  In my opinion the

2  owner would not accede to the tenant's request that I pay

3  for $9,000 worth of interior design work.  That was your

4  opinion, wasn't it?

5  A    Correct.

6  Q    Okay.  Well, here, if Jay is the tenant and he calls up

7  Randy and says, I want to put in $9,000 worth of interior

8  design, in your opinion, Randy would say, no, correct?

9  A    In this case it's not a typical case.  I don't know

10 what Randy would say would be my answer.  My supposition is

11 what he would say.

12 Q    Well, I don't want --

13 A    You want me supposition what Randy would say?

14 Q    No.  No.  There's no question pending.

15      Do you know Jeanette Oaks (phonetic)?

16 A    Yes.

17 Q    Do you know Donna Jeanette Interiors?

18 A    Yes.

19 Q    And those are two sisters?

20 A    It's an entity that does interior design work.

21 Q    Okay.  Well, Jeanette Oaks, she was the life of the

22 former state president, George Oaks, in our state, correct?

23 A    Yes.

24 Q    And Donna Jeannette -- who's Donna?  That's Jeanette's

25 sister?

60

1 A    I don't know Donna.

2 Q    Okay.  And Judith B. Design Team, have you heard of

3 them?

4 A    No.

5 Q    And you didn't talk to Jeanette about this matter, did

6 you?

7 A    No.

8 Q    And you didn't talk to her sister, Donna?  You don't

9 know her I guess, right?

10 A    No and no.

11 Q    And you didn't talk to anybody at Judith B. Design

12 Team?

13 A    No.

14 Q    So you don't know who requested or authorized the work

15 to be done?

16 A    I do not know for a 100-percent certainty.

17 Q    Have you talked to anybody who told you who did the --

18 who requested this work?

19 A    Did I talk to anyone?  No, to your question.

20 Q    And you haven't sought any documentation from any of

21 these people or entities as to who requested the work?

22 A    No, that wasn't necessary.

23 Q    Because you'd already made up your mind that you were

24 going to include these checks in this list, right?

25 A    That wasn't the reason.  There's another reason.

61

1        MR. MCCULLOUGH:  Let's go to the next portion of

2   this thing, and if we could highlight that top part there.

3   BY MR. MCCULLOUGH:

4   Q    In your report you state further:

5              "The following chart shows some of

6              the additional payments that Debtor made

7              for the 4600 Viro Road residence for

8              pest control services.  It could be

9              noted that the property owner typically

10             pays for these expenses."

11       Then if we could blow up that bottom part of the chart.

12   So we have over a five-year period of time a whole great big

13   $340 worth of pest control services, correct?

14   A    This was all I could find.

15   Q    I'm sure if you'd found more you would have put it in,

16   right?

17   A    I had very sketchy information.  I didn't have a

18   complete record.

19   Q    But you had hundreds if not thousands of checks on

20   their accounts, didn't you?

21   A    I have a very sketchy record.  I did not have a

22   complete record.

23   Q    Well, you found checks all the way from 1998 to 2002,

24   right?

25   A    I found some checks, yes.

*Briggs Reporting Company, Inc.*

62

1  Q    Didn't you -- didn't the Trustee subpoena checks from

2  Jay and Debbie's account and this is where you got them?

3  A    The Trustee subpoenaed checks from the accounts that we

4  were able to identify only.

5  Q    Were you able to identify the checks from the accounts

6  that we have listed here?

7  A    Yes.

8  Q    Okay.  And you got more than these, one, two, three,

9  four -- five checks, right?

10  A    Yes.

11  Q    That notice the bank didn't just produce checks payable

12  to the pest control company, did they?

13  A    That's correct.

14  Q    In fact, they produced hundreds of checks on the

15  account, right?

16  A    I don't recall the number.

17  Q    Well, I didn't ask you to recall the number.  I think

18  you testified earlier that you reviewed thousands of checks.

19  Do that refresh your recollection at all?

20  A    I reviewed thousands of checks for numerous bank

21  accounts.  I don't know if this was Debbie's account or

22  Jay's account or -- I don't -- I reviewed thousands of

23  checks, yes.  For this account, how many checks I reviewed,

24  I'm not able to say.

25            THE COURT:  Mr. McCullough, would this be a good

63

1  time to take the morning break?

2        MR. MCCULLOUGH:  That'd be fine, your Honor.

3  Thank you.

4        THE WITNESS:  Thank you.

5     (Proceedings recessed briefly.)

6        THE CLERK:  Please remain seated and come to

7  order.  This United States Bankruptcy Court is again in

8  session.  The Honorable Erithe Smith, Bankruptcy Judge,

9  presiding.

10       THE COURT:  All right.  We're back on.

11       Mr. McCullough.

12       MR. MCCULLOUGH:  Thank you, your Honor.

13 BY MR. MCCULLOUGH:

14 Q   Mr. Lapides, you've indicated that the owner would pay

15 for interior decorating.  If the tenant wanted to buy

16 furniture, that wouldn't be something that the owner would

17 pay for, would it?

18 A   Not typically in an unfurnished property.

19 Q   And if the tenant wanted to buy a Persian rug, and

20 asked the owner to buy that, that wouldn't be typically

21 something the owner would pay for, would it?

22 A   No.

23 Q   And particularly if they then moved out and took the

24 furniture and the rug with them, right?

25 A   Right.

64

1  Q    All right.  If we -- I wanted to just make one more

2  inquiry if I could with respect to the Jeanette Oaks and

3  interior design matters.

4        MR. MCCULLOUGH:  And if we could just highlight

5  that top chart there, please.

6  BY MR. MCCULLOUGH:

7  Q    You've indicated that you did know Jeanette Oaks,

8  correct?

9  A    Yes.

10 Q    In fact, she lived in your same ward, didn't she?

11 A    Yes.

12 Q    And you could have just picked up the state directory

13 or the ward directory and found her telephone number, right?

14 A    No.

15 Q    Are you saying that the Oaks didn't have, didn't have

16 their telephone number in the directory, church directory?

17 A    They moved out of state.

18 Q    Before they moved out of state, they were in your ward?

19 A    Yes.

20 Q    And you saw them?

21 A    Yes.

22 Q    On Sundays?

23 A    Yes.

24 Q    And when they were living in the ward, they were not

25 out of state, right?

65

1 A     No.

2 Q     They were in the State of California when they were in

3 our ward, right?

4 A     Yes.

5 Q     Okay.  Do you know what these checks paid for?

6 A     No.

7 Q     Could it possibly be that the checks were used to buy

8 furniture, a rug, something of that nature?

9 A     Sure.

10 Q     And if that's the case you would expect the tenant to

11 pay for that, wouldn't you?

12 A     Yes.

13 Q     So how do you know that this was money that Jay was

14 spending that shows that he was the owner of the property?

15 A     Based upon the entirety of the evidence I reviewed.

16 Q     Okay.  The ultimate question that we're searching the

17 answer for here is whether or not Jay or Randy was the buyer

18 of the property, right?

19 A     Yes.

20 Q     And in this instance, you're saying that these checks

21 proved that Jay was the owner, right?

22 A     No.

23 Q     Then why are they listed here?

24 A     Because it shows an indication that the Debtors were

25 paying for interior design work on the property.

66

1 Q    And if they were to pay for furniture and rugs it would

2 indicate otherwise, right?

3 A    Not necessarily one way or the other.

4 Q    It's "not necessarily one way or the other" the way it

5 is, the way you've just described it then, right?

6           MR. HINDS:  Argumentative, your Honor.

7           THE COURT:  Overruled.

8           You may answer.

9           THE WITNESS:  I was confused by your question.

10 Can you repeat, please?

11 BY MR. MCCULLOUGH:

12 Q    Now part of what we have been doing here and following

13 through with your report, is to see if we can see what

14 monies Jay paid towards the property in some fashion, and

15 what monies Randy paid, correct?

16 A    Yes.

17 Q    And wouldn't it be fair to say that the more money

18 Randy paid, the more likely he was the owner of the

19 property?

20 A    Yes.

21 Q    So, for example, if Randy was the one who put up the

22 $10,000 deposit, that would tend to lead us in the direction

23 that Randy was the owner of the property, right?

24 A    That would be a -- one indication.

25 Q    All right.  You don't like my wording that it would

67

1  tend to lead us in that direction?

2  A    No.

3  Q    But it would be an indication that he was the owner

4  then, is that what you're saying?

5  A    Yes.

6  Q    All right.  And if Randy was the one who paid the

7  additional $55,000 deposit, that would also be an indication

8  then that Randy is the owner of the property, correct?

9  A    Yes.

10 Q    And so, as we find additional monies being spent by

11 Randy for the property, that would tend to indicate that

12 Randy was the owner of the property, correct?

13 A    Yes.

14 Q    And the more and the more and the more money we find

15 that Randy has put into the property, the stronger and

16 stronger and stronger is the indication that he is the

17 owner, correct?

18 A    Yes.

19 Q    All right.  Let's go to Exhibit 209.01.  This is the

20 closing statement for the sale of the property from Mr.

21 Mitchell (phonetic) to Randy and Robin Johnson on December

22 15th, 1995, correct?

23 A    Yes.

24        MR. MCCULLOUGH:  And let's highlight the top

25 portion there of that highlighted part, please -- no, I'm

68

1  sorry.

2  BY MR. MCCULLOUGH:

3  Q    Okay.  Let's just take a look at what is indicated on

4  the closing statement.  The closing statements indicate

5  closing costs on the sale of the property as part of the

6  closing statement, correct?

7  A    Yes.

8  Q    And the closing statement would indicate who is to pay

9  certain closing costs?

10 A    Yes.

11 Q    And on this particular statement, for the buyer, Randy

12 and Robin Johnson, we see a loan origination fee of $16,875,

13 correct?

14 A    Yes.

15 Q    And that is a loan cost that is being charged to Randy

16 and Robin Johnson, correct?

17 A    I -- one second.  Yes.

18 Q    And then we have a credit report fee of $100 that's

19 also being charged to Randy and Robin Johnson, correct?

20 A    Yes.

21 Q    And then if you go down we have a document fee of $500.

22 That's also being charged to Randy and Robin?

23 A    Yes.

24 Q    And then a processing fee for $200.  To whom is that

25 being charged?

69

1  A     Randy and Robin Johnson.

2  Q     Then we have a tax service fee of $75.  Who is being

3  charged for that?

4  A     Randy and Robin Johnson.

5  Q     We have an underwriting fee of $596.  Who is that being

6  charged to?

7  A     They buyers.

8  Q     And the buyers are?

9  A     Randy and Robin Johnson.

10 Q     And then we have a lender inspection fee of $195.  Who

11 is being charged for that?

12 A     The buyer.

13 Q     And the buyer is?

14 A     Randy and Robin Johnson.

15 Q     Then we have an administration fee of $500.  Who is

16 being charged for that fee?

17 A     The buyer.

18 Q     And who is the buyer?

19 A     Randy and Robin Johnson.

20 Q     Okay.  And then we have a broker processing fee of

21 $1,000.  Who is being charged for that fee?

22 A     The buyer.

23 Q     And the buyer is?

24 A     Randy and Robin Johnson.

25 Q     And then we have a broker messenger fee for $35.  And

70

1  who is being charged for that big fee?

2  A     Randy and Robin Johnson.

3  Q     Then, if we could go down to -- leave those three

4  there, please.

5       It seems like there is no end to the fees that one must

6  pay for buying property.  We have prorations and adjustments

7  for taxes of $47.77.  Who's having to pay that?

8  A     Randy and Robin.

9  Q     And then we have escrow charges.  There's an escrow

10  fee, $668.75.  Who's paying that?

11  A     Randy and Robin.

12  Q     They have a loan tie-in fee of $125.  Who's paying

13  that?

14  A     Randy and Robin.

15  Q     And everybody wants to get their fee.  As we go down

16  further we see a title policy premium for $1,488.08.  Who is

17  having to pay that fee?

18  A     Randy and Robin.

19  Q     And then we have a sub-escrow fee of $57.50.  Can you

20  tell me who is being paid -- who is paying that?

21  A     Randy and Robin.

22  Q     We have a recording grant deed of $17.  Who is paying

23  that?

24  A     Randy and Robin.

25  Q     And we have a recording trust deed of $73.  I guess a

71

1  fee for reporting the trust deed, $73.  Who is paying that?

2  A    Randy and Robin.

3  Q    Okay.  Your voice is dropping just a little bit.  If

4  you could just speak a little louder.  We have a title

5  endorsement fee of $307.25.  Who is paying that?

6  A    Randy and Robin.

7  Q    I'm sorry, I couldn't hear you.

8  A    Randy and Robin.

9  Q    And then we have some more disbursements out of the

10 escrow.  I guess it looks like "ulee."  Maybe there's

11 something in front of that.  Many ulee fan for document

12 signing service, $125.  Who had to pay that fee?

13 A    Randy and Robin.

14 Q    And then we have the Valley Water Company for a

15 transfer fee.  I think it's $50.  Who paid that?

16 A    Randy and Robin.

17 Q    And we have Chase Courier for loan documents.  A fee of

18 $30.  Who paid that?

19 A    Randy and Robin.

20 Q    I didn't expect you to add of those up as you were

21 going through here, but I did add them up and it came to

22 $23,063.  You know, if anybody needs to they can double

23 check my addition here.  But all of those Viro Road closing

24 costs then were paid by Randy and Robin Johnson, correct?

25 A    Yes.  The account of Randy and Robin Johnson.

72

1  Q    Well, the money that went into the escrow went to pay

2  all these, and that money came from Randy and Robin Johnson,

3  didn't it?

4  A    I don't know.

5  Q    Let's go to the next exhibit, 209 -- well, it's the

6  same exhibit, but we have a different blow up of it.  And

7  we're in a different color.  Down near the bottom it says,

8  "John's insurance for balance due on insurance, $1,958 and

9  some cents.  And I believe that it is --

10 A    What page is this on?

11 Q    It's on the same document that we were just looking at.

12 A    I see it.

13 Q    Okay.  And it looks like it's just $1,958.  Do you see

14 that?

15 A    Yes.

16 Q    And so, who is paying for the insurance?

17 A    The account of Randy and Robin.

18 Q    And "the account of Randy and Robin" is Randy and

19 Robin?

20 A    Could be.

21 Q    Well, what does the document itself indicate is the

22 party who is being charged for the insurance?

23 A    Randy and Robin Johnson again.

24 Q    So they're the ones who are paying the fee out of the

25 escrow, correct?

73

1  A    I'm not sure of that.

2  Q    Now, this had to do with the construction loan when the

3  -- and purchase of the property that initially took place in

4  December 1995, correct, that we've just been through?

5  A    Yes.

6  Q    All right.  Let's go to Exhibit 14, page one.  And

7  we'll go to the first part that we have highlighted here.

8  This is the borrower's closing statement, dated January

9  27th, 1997.  And you'll recall in our discussions here that

10 this is when Randy and Robin had negotiated the take-out

11 loan or permanent loan from Downey Savings, remember all

12 that?

13 A    Yes.

14 Q    Okay.  And on this escrow closing statement, it

15 indicates that out of the loan is going to be taken interest

16 at $68.0277778 from January 24th, 1997 to February 1st,

17 1997, of $544.22.  Who is having to pay that?

18 A    I think that was taken out of the equity of the Viro

19 Road property.

20 Q    Well, it was taken out of the loan that was obtained

21 from Downey Savings, right?

22 A    It was taken out of the equity of the Viro Road

23 property.  And I guess you could say it's taken out of the

24 loan, too, before the proceeds were disbursed.

25 Q    Okay.  So, Randy and Robin have borrowed $620,000 to

74

1  put into the escrow, correct?

2  A    Yes.

3  Q    And then out of those funds came $544.22.  It was

4  charged against Randy and Robin Johnson, right?

5  A    It was taken out of the Viro Road property equity.

6  Q    It was deducted from the proceeds of the loan from

7  Downey Savings, correct?

8  A    Yes.

9  Q    And charged against the account of Randy Johnson,

10  correct?

11  A    You could phrase it that way, yes.

12  Q    Let's go to some more of that statement, and let's just

13  do part two.  Okay.  It looks like we have a credit report

14  for the lender that's charging $14.  Who's paying that?

15  A    It was taken out of the Viro Road property equity.

16  Q    It's taken out of the loan proceeds from the Downey

17  loan, correct?

18  A    Yes.

19  Q    And charged to Randy Johnson?  It's charged to his

20  account in the closing escrow statement, correct?

21  A    Yes.

22  Q    And then we have an appraisal fee for the lender of

23  $200.  Who is paying that?

24  A    It was taken out of the equity of the Viro Road

25  property.

75

1  Q    It's taken out of the loan from Downey Savings,

2  correct?

3  A    Yes.

4  Q    And it's being charged to who's account?

5  A    I think I just saw Randy's name on the title -- top.

6  Q    Okay.  So, Randy, right?  It's not a mystery, is it?

7  Do you know how to read this statement?

8  A    Yes.

9  Q    Okay.  So we have a loan being made at $620,000, and

10 out of that are going to come certain costs, right?

11 A    Yes.

12 Q    And one of the costs is a appraisal for the lender of

13 $200, right?

14 A    Yes.

15 Q    And it's going to come, it's going to be charged

16 against Randy's account, right?

17 A    Yes.

18 Q    So Randy's paying for this, and see he's got the loan

19 being made.

20 A    I would not say that, no.

21 Q    Well, I know you think that Jay and Randy are

22 conspiring to defraud you here, but as far as the document

23 itself is concerned, it reflects that the money is coming

24 out of the loan and charged to Randy, correct?

25 A    I would phrase it that it came out of the equity of the

76

1  Viro Road property, is the way I would phrase it.

2  Q    Is it incorrect to say that it's coming out of the

3  proceeds of the Downey loan?

4  A    No.

5  Q    Well, then let's stick with that, because that makes me

6  feel better.  There's a tax service for the lender of $79.

7  Who's paying that?

8  A    It came out of the equity of the Viro Road property.

9  Q    All right.  And that also is coming out of the $620,000

10 loan from Downey Savings, correct?

11 A    Yes.

12 Q    And being charged against whose account?

13 A    Randy, I believe.

14 Q    You believe or is that what the --

15 A    I -- yeah, it says, Randy on the first, on the title

16 page.  Randy.

17 Q    Okay.  That's all I'm asking.  Then we have a wire fee

18 of $50.  Is that coming out of the loan proceeds?

19 A    Yes.

20 Q    Being charged to Randy's account?

21 A    Yes.

22 Q    Then we have an underwriting fee of $325.  That's

23 coming out of the loan proceeds?

24 A    Yes.

25 Q    And being charged to Randy?

77

1  A     Randy's account.

2  Q     We have a flood charge of $12.  Coming out of the loan

3  proceeds?

4  A     Yes.

5  Q     Being charged to Randy?

6  A     Randy's account.

7  Q     And Randy's account is for who?  On this document,

8  Randy's account as you've been saying it is who's account?

9  That's Randy Johnson's account, isn't it?

10  A     When I said Randy, I was referring to Randy Johnson.

11  Q     Okay.  Then we have --

12         MR. MCCULLOUGH:  Let's go down to the next three

13  here, please.

14  BY MR. MCCULLOUGH:

15  Q     Then we have title charges, loan policy of $1,292.15,

16  correct?

17  A     Yes.

18  Q     Coming out of the loan proceeds, correct?

19  A     Yes.

20  Q     Being charged to Randy Johnson, correct?

21  A     Randy's account.

22  Q     Well, I guess if it makes you feel better to say

23  Randy's account as opposed to Randy, we'll settle for that

24  if it makes you feel better.

25         Then we have a sub-escrow fee of $185 coming out of the

*Briggs Reporting Company, Inc.*

78

1  loan proceeds?

2  A    Yes.

3  Q    Being charged to Randy's account?

4  A    Yes.

5  Q    We have a reconveyance tracking fee of $24.  That's

6  also coming out of $620,000 loan Randy obtained from Downey

7  Savings, correct?

8  A    Yes.

9  Q    And that's being charged to Randy Johnson's account?

10 A    Yes.

11 Q    Then we have a, under recording fees, a grant deed fee

12 of $7, correct?

13 A    Yes.

14 Q    Coming out of the loan proceeds?

15 A    Yes.

16 Q    And being charged to Randy Johnson, correct?

17 A    Randy's account.

18 Q    And then we have a trust deed fee of $45.  That's also

19 being paid out of the loan proceeds?

20 A    Yes.

21 Q    And so that's being charged against Randy's account?

22 A    Yes.

23 Q    And then a reconveyance fee of $25, coming out of the

24 loan proceeds?

25 A    Yes.

79

1  Q    And being charged against Randy's account?

2  A    Yes.

3  Q    And then we have Independent National Mortgage which

4  was the construction lender, right?

5  A    Yes.

6  Q    Okay.  And their loan is being paid off in the sum of

7  $562,500, right?

8  A    Yes.

9  Q    And they have to, of course, get their fee.  So they

10  have here a forwarding fee of $90.  That's also going to

11  come out of the Downey Loan proceeds, correct?

12  A    Yes.

13  Q    And that's also then going to be charged against Randy

14  Johnson's account?

15  A    Yes.

16  Q    And then we have a reconveyance fee of $65.  That's

17  also coming out of the Downey Savings loan?

18  A    Yes.

19  Q    And being charged to Randy Johnson's account?

20  A    Yes.

21  Q    And then we have a late charge of $241.81, also coming

22  out of the Downey Savings loan that Randy Johnson negotiated

23  and then paying, right?

24  A    I don't know that Randy Johnson negotiated the loan.

25  Q    Coming out of the Downey Loan though, right?

80

1  A    Yes.

2  Q    And being charged to Randy Johnson's account?

3  A    Yes.

4  Q    Well, again, I did not expect you to add these up in

5  your head as we were going along.  But for the record, my

6  addition shows that the Downey Loan charge -- or that the --

7  well, I guess I will back up.  We have Downey Loan charges

8  of $2,323, and that's where we are.  Okay.  Now, let's go

9  to --

10          THE COURT:  I'm sorry, Mr. McCullough.  What was

11  the figure?

12          MR. MCCULLOUGH:  Two-thousand-three-hundred-

13  twenty-three dollars for Downey Loan charges.

14  BY MR. MCCULLOUGH:

15  Q    If we go to the next thing that we have highlighted

16  here, we have interest being paid to Independent National

17  Mortgage of $9,097.33, correct?

18  A    I'm trying to locate that on the Exhibit.  What page is

19  it on?

20  Q    It's the same page.  It's down near the bottom and

21  she's highlighted it down there.

22  A    What page is this on?

23  Q    It's Exhibit 14, page one.  And at the bottom where it

24  says, "payoff Independent National Mortgage."  Below that,

25  we have highlighted in yellow, "interest to January 27th,

81

1  '97, in the amount of $9,097.33," right?

2  A    Yes.

3  Q    And that's also money that's coming out of the Downey

4  Savings loan, correct?

5  A    You mean the Downey Savings loan?

6  Q    Pardon?

7  A    Yes.

8  Q    So your answer to the question is, yes?

9  A    Correct.

10 Q    Okay.  And then we will go to our next highlighted

11 portion.  And it looks like we have additional charges, fire

12 insurance, Johns Insurance Agency (phonetic), $2,285.  Do

13 you see that?

14 A    No.

15 Q    Well, okay.  Can you -- well, it is hard to read?  I

16 apologize.  Maybe it's the color's a little too dark.  So

17 you can't read it on the screen, right?

18 A    No.

19 Q    Okay.  Then would you look at Exhibit 14.  And look at

20 the line down there where it says, "additional charges."

21 Have you found that?

22 A    No.

23 Q    Well --

24 A    I just out the book.

25 Q    I'm sorry.  You tell me when you have found it.

82

1  A    I have the book now.

2  Q    Okay.  And you're at Exhibit 14?

3  A    Yes.

4  Q    Exhibit 014.001?

5  A    Yes.

6  Q    And near the bottom do you see where it says,

7  "additional charges"?

8  A    Yes.

9  Q    And underneath that, do you see where it says, "fire

10 insurance, Johns Insurance Agency"?

11 A    Yes.

12 Q    And the amount, $2,285?

13 A    Yes.

14 Q    And that also would be monies coming out of the Downey

15 Loan, correct?

16 A    Yes.

17 Q    And being charged against Randy Johnson's account?

18 A    Yes.

19 Q    Okay.  Now, I want to go to the next highlight, which

20 is this page here.  Okay.  This is, again, still the same

21 closing statement with Design Escrow, Inc., but I just want

22 to go to the top where it says, "first trust deed Downey

23 Savings and Loan Association, $620,000."  That's the amount

24 of the loan that Downey Savings made to Randy Johnson as the

25 permanent takeout loan on the Viro Road property, correct?

83

1  A    I think this was the refinance loan.

2  Q    Okay.  Well, it would be appropriate to say it was a

3  permanent takeout loan to take out the construction loan,

4  right?

5  A    No.

6  Q    Did we see on that statement where Independent National

7  Mortgage was paid $562,500 on its loan?

8  A    Yes.  The construction loan was with Zilla -- Mozilla.

9         THE COURT:  I'm sorry, I can't hear you.

10         THE WITNESS:  I believe the construction loan was

11 from Mozilla, if I'm -- I don't know if I got the name

12 right, but Mozilla was in the name from the construction

13 loan.

14 BY MR. MCCULLOUGH:

15 Q    Yes.  We went over that.  And they sold the loan to

16 Independent National Mortgage, didn't they?

17 A    Yes.

18 Q    Okay.  So, when Downey's takeout loan came along, they

19 weren't paying Mozilla, they were paying Independent

20 National Mortgage, correct?

21 A    I just refer to this as the refinance loan.

22 Q    Well --

23 A    I thought the Independent was the takeout loan of the

24 construction loan.

25 Q    All right.  I'm sorry if there's some confusion, and if

84

1  I've caused it, I apologize even further.  But I don't want

2  us to get mixed up, so let me just very briefly go through

3  the history of this.  In 1995 --

4          THE COURT:  I think I can short-circuit this.

5  This testimony has already occurred.  I don't see any reason

6  to go over this.  His testimony is on the record.  I have

7  notes from what he testified to as to the entity known as

8  Independent National Mortgage or something like that, as

9  being the --

10          MR. MCCULLOUGH:  Okay.

11          THE COURT:  -- successor to Caros (phonetic),

12  whatever the other lender was, so that we don't have to go

13  down this road again.

14          And I don't mean to interject, but, Mr. Lapides,

15  when you don't recall testimony, we have a limited amount of

16  time, I'm going to take your original testimony as your

17  testimony --

18          THE WITNESS:  Thank you.

19          THE COURT:  -- so that we don't have to keep back-

20  peddling and going over, you know, areas that we've already

21  covered.

22          MR. MCCULLOUGH:  Okay.  Thank you, your Honor.

23  BY MR. MCCULLOUGH:

24  Q    Okay.  So we see from this document when the Downey

25  loan is being made in January of 1997, the loan amount is

85

1  $620,000, agreed?

2  A    Yes.

3  Q    Okay.  Now, I'd like to go to the next exhibit, which

4  is Exhibit 29.  Do you have that?

5  A    Yes.

6  Q    I do want to ask you one or two questions about what we

7  just went over on the prior closing statement, where we

8  listed all the charges that were being made against Randy

9  Johnson's account.  Did you take into consideration in your,

10 forming your opinion as to who bought the Viro Road

11 property, the fact that all of those charges were being made

12 against Randy Johnson, the Johnsons' account?

13 A    Yes.

14 Q    And did that, did those charges indicate to you that

15 the owner of the property was Randy or Jay?

16 A    It didn't give an indication.

17       THE COURT:  I'm sorry.  I didn't hear that.

18       THE WITNESS:  It did not give that indication from

19 just that fact alone.

20 BY MR. MCCULLOUGH:

21 Q    Well -- but I'd like for you to concentrate just on

22 that fact alone.  All of those charges were, it was

23 indicated that all those charges were for Randy Johnson's

24 account, correct?

25 A    Yes.

*Briggs Reporting Company, Inc.*

86

1 Q    And if in fact Randy Johnson made, you know, made those

2 payments, that would be an indication that he was the owner

3 of the property, correct?

4 A    Misstates the fact.  That doesn't -- Randy Johnson did

5 not make those payments according to the statement you

6 showed me.

7 Q    The statement indicated that they were being made by

8 Randy Johnson, didn't it?

9 A    It did not.

10 Q    Did the statement indicate somebody else was making

11 those payments?

12 A    The statement indicated that the expenses were coming

13 out of the Viro Road property equity.  It was not paid by an

14 individual.

15 Q    The statement didn't talk about any equity in Viro

16 Road, did it?

17 A    I know that's what it meant.

18 Q    You're a real estate expert with respect to these types

19 of transactions then?

20 A    Yes.

21 Q    And an expert on how closing statements read?

22 A    Yes.

23 Q    And how loan documentation should be interpreted?

24 A    Yes.

25 Q    And how loan proceeds are treated with respect to the

87

1  purchase of property?

2  A    I don't understand the question, how they were treated.

3  Q    Well, when somebody purchases a piece of property and

4  they borrow money from a bank, that money goes into an

5  escrow to be disbursed in a certain fashion, correct?

6  A    Yes.

7  Q    And certain proceeds are going to go to a buyer?

8  A    Yes.

9  Q    I'm sorry.  To a seller.

10 A    You mean, the dollar worth?  Could you repeat?  I'm

11 sorry.

12 Q    Yes.  I apologize.  The -- if a buyer borrowers money

13 to purchase the property and he puts that money in the

14 escrow, some portion of that money is going to go to the

15 seller for the purchase of the property, right?

16 A    You're talking about "the purchase of the property,"

17 and we were talking about the refinance before.

18 Q    Yes, I understand.

19 A    Is your question concerning the purchase now?

20 Q    I thought that's what it was.  If you have a buyer

21 who's buying a property from a seller, and the buyer has to

22 borrow the money.  And he puts it into the escrow company,

23 so the escrow company can keep a hold of it until title to

24 the property is transferred, to protect his interest.  And

25 then when the escrow closes, some portion of those borrowed

*Briggs Reporting Company, Inc.*

88

1 funds are intended to go to the seller for the purchase

2 price of the property, right?

3 A    Yes.

4 Q    Okay.  If a buyer is not only buying the property but

5 is also going to construct something on the property, then

6 it would be normal to obtain a construction loan as well,

7 right?

8 A    Yes.

9 Q    Okay.  And as the construction goes on, the funds are

10 going to be paid out of the construction loan for the

11 purpose of the construction, correct?

12 A    That's -- yes.

13 Q    Okay.  And at the end of the construction and the end

14 of the loan, the borrower's go to pay that money back,

15 right?  I mean, the construction lender didn't give the

16 money to him free, he's, the construction --

17 A    Either the borrower has to pay it back or it could come

18 out of the equity of the property.

19 Q    The -- at the end of the term of the loan, the

20 construction lender wants money back to pay the loan, right?

21 A    Yes.

22 Q    Okay.  And the construction lender really isn't too

23 concerned where the money comes from, is he?

24 A    No.

25 Q    And so, the borrower could just go pay, write out a

89

1  check out of his account if he has money there, and pay the

2  construction lender, right?

3  A    Yes.

4  Q    Or the borrower on the construction loan could go to

5  another lender and borrow more money to pay the construction

6  lender, right?

7  A    Yes.

8  Q    And in this case, isn't that what happened?  Do you

9  want me to --

10  A    Are you talking about the purchase or Downey?

11  Q    In this particular case, initially, there was a

12  construction loan, which was eventually purchased by

13  International Mortgage, correct?

14  A    That's correct.

15  Q    International -- whatever it is.  INMC.  And then the

16  construction funds were used to do the construction,

17  correct?

18  A    Yes.

19  Q    And then when the construction was over, INMC wanted

20  its loan paid back, correct?

21  A    Yes.

22  Q    Okay.  And Randy Johnson got a loan from Downey,

23  borrowed money from Downey, to pay back INMC's construction

24  loan, right?

25  A    Yes.

90

1  Q    Okay.  And the money that Randy got from Downey Savings

2  went into the escrow to be used to pay off INMC, correct?

3  A    Yes.

4  Q    And when the escrow closed, the escrow company took the

5  money from the Downey Savings loan that had been put in

6  escrow, and used part of those funds to pay INMC's

7  construction loan off, right?

8  A    Yes.

9  Q    Okay.  So now, at that point, Downey Savings has a

10 $620,000 loan that at some point in time, it's going to want

11 to have paid back, right?

12 A    Yes.

13 Q    Okay.  So, now we go to Exhibit 29.001, and this is the

14 closing statement from Design Escrow, dated October 11th,

15 2001, in which Randy Johnson sells the Viro Road property.

16 And you're aware that he eventually sold the property,

17 right, to Michael McFall (phonetic)?

18 A    I'm aware that there was a transaction with Michael

19 McFall.

20 Q    All right.  And the transaction took the form of a sale

21 of the property from Randy Johnson to Michael McFall, didn't

22 it?

23 A    Not exactly.

24 Q    Well, I understand you think that there's some fraud

25 involved here, but at least on paper it appeared to be a

91

1 sale of the property by Randy to Michael McFall, correct?

2 A    Not from this paper that you showed me on Exhibit 29.

3 Q    Well, let's take a look at Exhibit 29.  Let's highlight

4 the top portion here.  First of all, Design Escrow, Inc. is

5 the escrow company?

6 A    Yes.

7 Q    And this particular document is called, "seller final

8 settlement statement"?

9 A    Yes.

10        MR. MCCULLOUGH:  And then let's go down and

11 highlight a little bit more, please.

12 BY MR. MCCULLOUGH:

13 Q    It identifies the property as that being at 4600 Viro

14 Road, La Canada, Flintridge, California 91011, correct?

15 A    Yes.

16 Q    And it indicates a closing date of October 11th, 2001?

17 A    Yes.

18 Q    And then it gives us the escrow number of the

19 transaction, correct?

20 A    Yes.

21 Q    And it indicates who as the seller of the property?

22 A    Yes.

23 Q    Well, who does it indicate as the seller of the

24 property?

25 A    It indicates the seller as Randal Allan Johnson.

92

1 Q    Okay.

2        MR. MCCULLOUGH:  Now, if we can go down here, down

3 to here, please.

4 BY MR. MCCULLOUGH:

5 Q    All right.  Now, it indicates that the consideration

6 being paid for the property is what?

7 A    This document shows $1,250,000.

8 Q    Okay.  Now, you don't think that the escrow company

9 drew up a phony document here that we're looking at, do you?

10 A    No.

11 Q    In fact, you believe this to be an accurate depiction

12 of the transaction which it represents?

13 A    No.

14 Q    Well, maybe I should put that a little differently?

15 You don't think the escrow company had anything to do with

16 phonying up this transaction, do you?

17 A    No.

18 Q    Okay.  I'm just going to talk about this particular

19 document.  I'm not going to talk about any underlying, you

20 know, fraud or alleged fraud between the parties, I just

21 want to focus on this document.

22      It indicates that there is a payoff to Downey Savings,

23 correct?

24 A    Yes.

25 Q    And it says the total payoff is $681,660.02, correct?

93

1  A    That's different from what I'm looking at in front of

2  me.

3  Q    See where it says, "payoff charges to Downey Savings

4  and Loan Association"?

5  A    I'm sorry.  I was looking at the right-hand side.  Yes,

6  you're correct.  That's what it shows, 681,660-point-two --

7  02.

8  Q    Okay.  And then underneath that it breaks it down into

9  the principal balance, correct?

10  A    Yes.

11  Q    And what's the principal balance?

12  A    Do you want me to read it?

13  Q    Yes.

14  A    Six-seven-five-eight-nine-four-seven-five.

15  Q    Okay.  And then underneath the principal balance it

16  indicates interest on the principal balance, correct?

17  A    Yes.

18  Q    And how much is that?

19  A    Do you want me to read it?

20  Q    Yes.

21  A    Five-thousand-six-hundred-and-twenty-five dollars and

22  27 cents.

23  Q    Okay.  Now, my question to you is this.  Downey Savings

24  loaned $620,000, correct?

25  A    Yes.

94

1  Q    And Downey Savings is being paid back $675,894.75 in

2  principal, and $5,625.27 in interest, right?

3  A    Yes.

4  Q    Why is Downey being paid more than they loaned?

5  A    It appears that something happened between the original

6  acquisition of the $620,000 and this date of October 11th,

7  2001 --

8  Q    Okay.

9  A    -- things occurred.

10  Q    Okay.  The difference, just for the record, is

11  $55,894.75.  Now, you've indicated you're a real estate

12  expert.  You know all about escrows and real estate

13  transactions.  What accounts for that difference?

14  A    Several things could possibly account for it.  I don't

15  -- I can't say what accounts for it in this instance.

16  Q    Did you examine all the exhibits involved in this case?

17  A    Yes.

18  Q    Did you examine the loan documentation with Downey

19  Savings and Loan?

20  A    Yes.

21  Q    Did you examine the closing documents with respect to

22  the Downey Savings loan?

23  A    Yes.

24  Q    And you've examined the documents for the sale of the

25  property from Randy Johnson to Michael McFall?

95

1  A    Yes.

2  Q    And from those documents, could you determine what

3  accounts for the difference of the $55,894.75?

4  A    No.

5  Q    Did you try to figure it out, why there is a difference

6  between the two?

7  A    No.

8  Q    Was that unimportant to you?

9  A    Yes.

10 Q    Did it raise any question in your mind as to what that

11 means --

12 A    No.

13 Q    -- the different -- in the difference between the two?

14 A    No.

15 Q    Now, in this particular transaction, that difference of

16 $55,000 is being charged to Randy's account, right?

17 A    This is a specific document that refers to expenses

18 taken out of the Viro Road property equity.  No one is

19 actually paying these amounts.

20 Q    Well, I'm not sure I necessarily agree with you, but if

21 it's coming out of the equity it's coming out of Randy's

22 pocket then, right?

23 A    No.

24 Q    That's because it's coming out of Jay's pocket?

25 A    No.

96

1  Q    Well, then explain to me whose pocket it's coming out

2  of.

3  A    It's coming out of neither Randy nor Jay's, but the

4  Viro Road property's equity.

5  Q    And the person who is entitled to the equity is the

6  owner of the property?

7  A    Yes.

8  Q    All right.  So, who's pocket did it come out of?  I

9  mean, we're being --

10  A    I can't say.

11  Q    I'm sorry.  I didn't mean to cut you off.  But we're

12  agreed that it's coming out of the owner's pocket, right?

13  A    No.

14  Q    I thought you said it was coming out of the equity of

15  the property?

16  A    Yes.

17  Q    And who owns the equity of the property?  You can just

18  used a genetic term.  Owner would be fine.  So it comes out

19  of the --

20  A    Jay and Debra Johnson.

21  Q    Well, let's take it one step at a time.  The equity

22  would be owned by the owner, whoever that is, correct?

23  A    Yes.

24  Q    And on paper that we have in front of us, the owner is

25  Randy, right?  I'm not talking about the, quote, "real

97

1  covert owner," I'm just talking about, the documentation

2  itself shows the owner as Randy, correct?

3  A    Well, this shows the seller as Randy.

4  Q    I'm sorry.  Well, yes, it shows Randy as the seller, so

5  he was the owner, right?

6  A    No.

7  Q    On paper?

8  A    Yes.

9  Q    Who does -- in this escrow transaction that's taking

10 place here, who is reflected as the seller?

11 A    Randy Johnson.

12 Q    All right.  And that would indicate that Randy is the

13 owner of the property, right?

14 A    No.

15 Q    Can a non-owner sell the property?

16 A    No.

17 Q    Okay.  So, if the owner is the seller of the property,

18 and the seller is identified as Randy, doesn't that indicate

19 that Randy is the owner?

20 A    No.

21 Q    The $55,000 that we have here, you've indicated came

22 out of the equity of the property, correct?

23 A    Yes.  Yes.

24 Q    And if in fact Randy Johnson is the owner of the

25 property, then it would be coming out of his pocket,

98

1 correct?

2 A    It's still coming out the -- I would still stay with my

3 statement, it came out of the property's equity and not out

4 of anybody's pocket.

5 Q    If Randy is the owner of the property, the equity would

6 belong to Randy, correct?

7 A    Yes.

8 Q    And so, if the $55,000 comes out of the equity of the

9 property, it's coming out of Randy, right?

10 A    No.

11 Q    Is that because you're saying Randy's not the owner,

12 Jay is the owner?

13 A    My statement was, that the expenses are coming out of

14 the property's equity, out of neither Randy nor Jay's

15 pocket.

16 Q    Okay.  If it's coming out of the equity of the profit

17 -- out of the equity of the property, does that mean that

18 less equity is going to go back to the seller?

19 A    Yes.

20 Q    And if Randy is in fact the owner of the property, I

21 want you to assume that to be true for the moment, that

22 means Randy is going to get less equity out of the property?

23 A    Yes.

24 Q    And can you tell me why Downey Savings and Loan is

25 being paid an additional $55,000 over and above what it

*Briggs Reporting Company, Inc.*

99

1  loaned?

2  A    No.

3  Q    And it just doesn't make any difference to you one way

4  or the other?

5  A    Well, I know that several -- I could come up with

6  several answers, but it doesn't make any difference to my

7  conclusion, no.

8  Q    Let's go to exhibit -- it's the same exhibit, Exhibit

9  29, but we have a different blow up here.

10           MR. MCCULLOUGH:  And perhaps we could blow up this

11  first part here.

12  BY MR. MCCULLOUGH:

13  Q    There are certain charges to be made to the parties

14  with respect to the transaction, right?

15  A    Yes.

16  Q    And we have, we've spoken about the payoff charges in

17  part, to Downey Savings.  They're going to get a whopping

18  675,000 plus 5,000, almost -- $680,000.  Now I want to focus

19  on some additional costs.  We have a forwarding fee of $75,

20  do you see that?

21  A    Yes.

22  Q    And that is being charged against Randy Johnson's

23  account, correct?

24  A    Yes.

25  Q    And then we have a reconveyance fee of $65, and that's

100

1  being charged against Randy Johnson's account, correct?

2  A    Yes.

3        MR. MCCULLOUGH:   And then if we go down to the

4  next set here, please.

5  BY MR. MCCULLOUGH:

6  Q    Then we have some charges to Wells Fargo Home Mortgage,

7  Inc.  Apparently somebody was borrowing money from Wells

8  Fargo to buy the property, right?  Can could read this --

9  A    That was not my conclusion.

10 Q    That Wells Fargo wasn't making any -- didn't have

11 anything -- well, in your opinion, did Wells Fargo Home

12 Mortgage, Inc. have anything to do with this transaction?

13 A    Yes.

14 Q    All right.  And under their name it says, "loan

15 origination fee."  Do you know what that means?

16 A    Yes.

17 Q    What?

18 A    Points charged for the loan.

19 Q    Okay.  And who's making the loan?

20 A    Home Mortgage, Inc.

21 Q    Okay.  That would -- wouldn't that indicate that the

22 buyer is having to get a loan to buy the property?

23 A    Not in this case, no.

24 Q    "Not in this case."  But there is a loan origination

25 fee of $13,125?

101

1  A      Yes.

2  Q      And that's being charged against the account of Randy

3  Johnson, right?

4  A      Yes.

5  Q      And then we have an appraisal fee of $750.  That's

6  being charged against the account of Randy Johnson?

7  A      Yes.

8  Q      We have a credit report fee of $12.  That's being

9  charged his account?

10 A      Yes.

11 Q      Randy Johnson, his account?

12 A      Yes.

13 Q      And then a tax service fee of $105.  Who's being

14 charged for that?

15 A      Yes.

16 Q      Being Randy Johnson?  I didn't say Randy Johnson, I

17 just said, who?  And you said, yes.  Are you -- maybe you're

18 getting tired of hearing me.  But it's -- that's being

19 charged against Randy Johnson's account, correct?

20 A      Sort of.

21 Q      Well, it's not being charged against anybody else's

22 account, is it?

23 A      It is being charged against the property's equity.

24 Neither Randy Johnson nor Jay Johnson pay these payments --

25 expenses.

102

1  Q    Well, according to the document we're looking at, it

2  indicates the seller is Randy Johnson, correct?

3  A    Yes.

4  Q    And it's indicating that these charges are being

5  charged the seller, correct?

6  A    That's the unusual thing.

7  Q    Well, if there is a negotiated deal between a buyer and

8  a seller, they can determine who's going to pay the costs of

9  the deal, right?

10 A    Typically, that's correct.

11 Q    Well, nobody's imposing upon them who has to pay the

12 costs, isn't that right?  Isn't that a matter that's left up

13 between the parties?

14 A    Typically, yes.

15 Q    Okay.  Now you've been involved in lots of real estate

16 transactions, right?

17 A    Yes.

18 Q    And don't you bargain with the other party as to who's

19 going to be paying what costs?

20 A    Yes.

21 Q    And so, in this particular case, it appears that the

22 bargain was that Randy is going to pay, as the seller, going

23 to pay the charges, right?

24 A    I've never seen anything like this particular case

25 before.

103

1  Q    Well, okay.  Maybe you've never seen anything like

2  this, but isn't that what this indicates, that Randy's being

3  charged these charges here?  Let me ask it a different way.

4  A    Thank you.

5  Q    Normally, the buyer who goes out and negotiates a loan

6  to buy the property, he usually is the one who pays the

7  origination fee, right?

8  A    Yes.

9  Q    But if the buyer says, for whatever reason, hey, I'm

10 not going to pay the origination fee, Mr. Seller, I want you

11 to pay it.  And the seller says, all right, all right, I'll

12 pay it.  Then they can come to that agreement, can't they?

13 A    It's possible.  I've never seen it before.

14 Q    Okay.  But that's what appears to be the case here,

15 right?

16 A    This is what's shown on this statement, yes.

17 Q    Okay.  Then we go down to a processing fee of $395,

18 that's also being charged to Randy's account, correct?

19 A    I'm more comfortable with saying it's taken out of the

20 property's equity.

21 Q    Well, whether it's being taken out of the equity or

22 not, it's being charged to Randy.  Somehow it's going to

23 come out of his equity, right?

24 A    I don't believe Randy doesn't -- has any equity in the

25 property.

104

1 Q    Well, I know.  I understand.  You think everybody is a

2 crook here.  But my question is, on this piece of paper, it

3 identifies the seller as Randy, and he's the one who's going

4 to be charged for all these costs, correct?

5 A    Randy's not paying this.  This is paid by the

6 property's equity.

7 Q    Let's go down to the next one.  Underwriting fee for

8 Wells Fargo, $425.  That's coming out of Randy's side of the

9 transaction, correct?

10 A    It's again coming from the Viro property equity.

11 Q    Well, we have interest at $164.81 a day from October

12 11th, 2001 to November 1st, 2001, of $3,461.01, right?

13 A    Yes.

14 Q    And on this particular statement, the seller's final

15 settlement statement, that's in the ledger calling for the

16 seller, Randal Allan Johnson, correct?

17 A    That's in the left-hand column of the ledger, yes.

18 Q    So my statement was correct.  It's the column for the

19 seller, Randal Allan Johnson?

20 A    Yes.

21 Q    And then we have a new second trust deed to Wells

22 Fargo, Equity Direct.  And we have a charge for another loan

23 origination fee of $1,125, correct?

24 A    Yes.

25 Q    And that's on Randy's side of the ledger as well,

105

1  right?

2  A    This is also coming out of the Viro property equity.

3  Q    But it's on Randy Johnson's side of the ledger,

4  correct?

5  A    Yes.

6  Q    And then we have -- let's see.  I guess we ought to

7  blow this up.  We have some title policy charges, a CLTA

8  Title policy fee of $2,605?

9  A    Yes.

10  Q    Being charged to Randy's side of the ledger, right?

11  A    It's shown on the left side of the ledger.

12  Q    And who is shown on the left side of the ledger?

13  A    Randy Johnson.

14  Q    And then we have an Alta Title policy fee of $822.

15  Whose side of the ledger is that one?

16  A    The left-hand side.

17  Q    And that is?  Who's the left-hand-side of the ledger?

18  A    Seller.

19  Q    And who is the seller indicated?

20  A    Randy Johnson is indicated.

21  Q    And we have a title sub-escrow fee of $100 on who's

22  side of the ledger does that stand?

23  A    Left-hand side.

24  Q    And that "left-hand side" is for?

25  A    Seller.

106

1  Q    "Seller."  Absolutely the seller.  And the seller is

2  indicated as?

3  A    Randy Johnson on this document.

4  Q    And then we have a wire, we'll just call it a wire fee,

5  of $50.  Do you see that?

6  A    Yes.

7  Q    And whose side of the ledger?

8  A    Left-hand side.

9  Q    And the "left-hand side" is for who?

10  A    Seller.

11  Q    And who is the seller?

12  A    The shown seller is Randy Johnson.

13  Q    And then if we could go to the last one.  It says,

14  "escrow fee to Design Escrow of $3,000."  Whose side of the

15  ledger?

16  A    The left side.

17  Q    And who is represented on the left side?

18  A    Seller.

19  Q    And who is identified as the seller?

20  A    Randy Johnson.

21        MR. MCCULLOUGH:  And if we can go to the second

22  page of the escrow statement and highlight that top portion,

23  please.

24        And when we finish with this page, that would be a

25  good place to stop, your Honor, if we can go that far.

107

1      THE COURT:  All right.

2 BY MR. MCCULLOUGH:

3 Q    And we have here a recording grant deed fee of $11.

4 Whose side of the ledger?

5 A    Randy's.

6 Q    Recording trust deed fee of $127.  Whose side?

7 A    It's on Randy's side.

8 Q    Recording reconveyance fee of $21, whose side?

9 A    It's on Randy's side.

10 Q    I'm sorry?

11 A    It's on Randy's side.

12 Q    And a recording quit claim deed of $14?

13 A    It's on Randy's side.

14 Q    Monitoring fee?

15 A    It's on Randy's side.

16 Q    And a documentary transfer tax of $1,375?

17 A    It's on Randy's side.

18      MR. MCCULLOUGH:  If we could just highlight this

19 last part, please.

20 BY MR. MCCULLOUGH:

21 Q    And we have last of all I think, a disbursement for

22 Abernathy Insurance of $849.  Do you see that?

23 A    Yes.

24 Q    And that's on whose side of the ledger?

25 A    It's on the left side of the ledger.

108

1  Q    And who is on the left-hand side of the ledger?

2  A    It's shown as Randy.

3         MR. MCCULLOUGH:  This would be a good time to

4  stop.

5         THE COURT:  All right.

6         We'll reconvene at 1:30.

7     (Proceedings recessed to reconvene.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

109

1               <u>AFTERNOON SESSION</u>

2                    --oOo--

3          THE CLERK:  Please remain seated and come to

4  order.  This United States Bankruptcy Court is again in

5  session.  The Honorable Erithe Smith, Bankruptcy Judge,

6  presiding.

7          THE COURT:  Mr. McCullough.

8          And, Mr. Lapides, I will remind you that you are

9  still under oath.

10          THE WITNESS:  Thank you.

11    RICHARD LAPIDES - DEFENDANT'S WITNESS - PREVIOUSLY SWORN

12               CROSS-EXAMINATION (RESUMED)

13  BY MR. MCCULLOUGH:

14  Q    Well, Mr. Lapides, I want to just very briefly go back

15  to page 100 of your report, Exhibit 227, which is the list

16  of checks that you indicated were showing that Jay had paid

17  for construction work and that on his house.

18  A    I have it.

19  Q    I believe you indicated -- well, let me back up.  There

20  are a couple of checks that we spoke about.  One was a

21  little bit more than the middle of the way down where it

22  says, "Anderson."  Do you see that one for $640?

23  A    Yes.

24  Q    And then we go down two more checks and we see another

25  one to Anderson for 1,250, and then the next one for

110

1  Anderson 1,250?

2  A     Yes.

3  Q     And then we go down just a little bit further and we

4  see the Anderson Company check labeled "deck repairs"?

5  A     Yes.

6  Q     And I believe you indicated that it was your opinion

7  that this Anderson of these checks was somebody that did

8  some kind of construction work on the Viro Road property?

9  A     Yes.

10 Q     And I asked you if you knew if the David Anderson and

11 the Anderson and the Anderson Company were all the same.

12 And do you think that they are all the same person or entity

13 being referred to?

14 A     Yes.

15 Q     Now we -- I'm sure you'll remember that we saw two of

16 the checks which looked like they were deposited in Rexburg,

17 Idaho, correct?

18 A     Yes.

19 Q     And if I recall, those are the two $1,250 checks.  The

20 one was a little difficult to see in the back, and the other

21 one was quite clear.  We could read the credit union in

22 Rexburg, Idaho, remember?

23 A     Yes.

24 Q     You're not an art collector, are you?  Or maybe you

25 are.  Are you?  I should say, are you an art collector?

111

1  A    No.

2  Q    Are you familiar with -- I mean, everybody knows of

3  Mona Lisa and Rembrandts and things like that.  But are you

4  familiar with, like the local artists at all who might be

5  kind of a up-and-coming artist?

6  A    No.

7  Q    Are you aware that Idaho has places where a lot of

8  artists will congregate to apply their trade?

9  A    No.

10  Q    Have you ever heard of a David Anderson who is an

11  artist in Rexburg, Idaho?

12  A    No.

13  Q    If in fact there is a David Anderson who is an artist,

14  like a local artist.  He's not Rembrandt.  But, you know, a

15  local artist who has his studio in Rexburg, Idaho.  If you

16  were to learn that information about the David Anderson on

17  these two $1,250 checks, would that change your opinion as

18  to whether or not that David Anderson did construction work

19  on the Viro Road property?

20  A    I didn't understand the question.

21  Q    I'm sorry.  It was probably too long.  If you were to

22  learn and understand that David Anderson was an artist in

23  Rexburg, Idaho, would you change your opinion about his

24  being paid for doing construction work on the Viro Road

25  property in La Canada?

112

1  A      I don't know.  It depends.

2  Q      Well, what would it depend upon?

3  A      It depends on what the $1,250 checks that are made out

4  to David Anderson, what they were for.  If there were

5  receipts to back it up, I would certainly be -- that would

6  influence my decision.

7  Q      So, in other words, if you did some kind of

8  investigation.  For example, maybe called David Anderson in

9  Rexburg, Idaho and talked to him, and said, hey, you know,

10 what are you?  And he says, I'm an artist.  And you say, did

11 you ever do any construction work in California?  He says,

12 no.  I've never even been to California.  That would have a

13 tendency to influence your opinion, wouldn't it?

14 A      No.

15 Q      Why not?

16 A      He said if I called up David Anderson in Utah and asked

17 if he was an artist, would that affect my opinion?  No, it

18 wouldn't affect my opinion.  There might be a David Anderson

19 in Provo that does art work.  But it -- in that regard, it

20 wouldn't affect my opinion from what you presented to me.

21 Q      Okay.  Well, I'm sorry.  I'm sure I didn't make myself

22 clear here.

23      If somehow you were investing whether or not David

24 Anderson did work on the Viro Road property in California,

25 and if you saw in the back of the check where it says,

113

1  deposited to an account at a credit union in Rexburg, Idaho,

2  not Provo, but Rexburg, Idaho.  And you looked up on the

3  internet or you called the phone company or looked in the

4  telephone book or something, and you found a David Anderson

5  in Rexburg, Idaho.  And you called and you spoke to him.

6  He's say, yeah, I'm David Anderson.

7       And from that conversation you learn from him that,

8  hey, I'm a local artist here in Rexburg, Idaho.  I don't do

9  construction work.  I've never done any construction work in

10 Viro Road in California.  Would that have an effect upon

11 your opinion that these two checks for $1,250 each to David

12 Anderson, were perhaps not for construction work on Viro

13 Road?

14 A    No.

15 Q    You'd still think that these two checks were for

16 construction work on Viro Road?

17 A    Yes.

18 Q    What if you went to Rexburg, Idaho, because the Trustee

19 said, this is really important.  I've got to know the answer

20 to this question.  And flew you all the way to Rexburg,

21 Idaho, and you went in and you saw David Anderson painting

22 away in his studio, and spoke with him and asked him, did

23 you do any work, construction work in  La Canada,

24 California?  And he said, no.  Would that change your

25 opinion as to whether or not these two checks here were to a

114

1  David Anderson for construction work in La Canada?

2  A    No.

3  Q    And if in your conversation with David Anderson in

4  Rexburg, Idaho, you showed him copies of these two checks,

5  and he said, yeah, I remember getting those two checks from

6  Jay Johnson.  He bought a couple of my paintings or a

7  sculpture, then I deposited them over there at the local

8  credit union where I bank.  Would that tend to influence

9  your opinion as to whether or not these two checks to David

10  Anderson for $1,250 were for construction work on the Viro

11  Road property?

12  A    Yes.

13  Q    Okay.  So, at some point, if you learn enough

14  information, you might have a different opinion than you

15  have now?

16  A    Correct.

17  Q    And that would go with respect to any one of these

18  payees here, correct?

19  A    No, not correct.

20  Q    So, for example, if you went to see Architectural

21  Lighting and Design, and asked them, have you ever done any

22  work on Viro Road in La Canada, and they said, no, would

23  that not also have an effect upon your opinion as to whether

24  or not they did any work in La Canada?

25  A    No.

115

1  Q    If you went to David Paynter and said -- and showed him

2  the check that you have here, these two $600 checks.  We'll

3  just pick these out in the middle here.  And said, hey,

4  David, I've got these two checks here.  They're payable to a

5  David Paynter.  Is that you?  And he says, yes.  And he --

6  you said, well, what were they for?  He said, I did some

7  work over in Montebello for a project that Jay Johnson had

8  there.  Would that have an effect upon your opinion as to

9  whether or not these two checks were for work on Viro Road?

10  A    With additional verification, yes.

11  Q    Okay.  That's what I'm asking.  If you had additional

12  information regarding any one of these payees here and the

13  checks that are listed, that indicated that it was not for

14  work on Viro Road but from something else, then as a honest

15  expert trying to find out the truth, you might change your

16  opinion, right?

17  A    No, to the question as phrased.

18  Q    And how would I phrase it to get you to say, yes?

19  A    Well, if there's --

20  Q    I mean, what does it take to --

21  A    -- seventy-thousand dollars that I'm 100-percent

22  convinced that they went to Viro Road property improvements,

23  because the Debtor, Jay Johnson, testified to that, I

24  wouldn't need any more information on that.  But as to the

25  other items that I'm not 100-percent sure of, then it would

116

1  affect -- then if I had more verification it could affect my

2  opinion, yes, and it could change my opinion, yes.

3  Q    So would it be fair to say that perhaps you don't have

4  enough information with respect to these checks, forgetting

5  the David Paynter up at the top here and the little things

6  at the bottom, but all those checks in the middle that we

7  talked about, would it be fair to say you did not have

8  enough information regarding those checks to really say one

9  way or the other whether or not they went to work on Viro

10 Road?

11 A    No, I wouldn't say that.

12 Q    And the only information you have is what you've told

13 us before?

14 A    No.

15 Q    Okay.  Let's go one last time to Exhibit 29, the second

16 page.  This is the escrow closing statement for the sale of

17 the property to -- from Randy Johnson to Michael McFall.

18 We've been through this in some detail.

19          MR. MCCULLOUGH:  And if we could have the lights

20 dimmed, please.  And if we could have the young lady here to

21 my right highlight that portion that says, "net proceeds,

22 5,124."

23 BY MR. MCCULLOUGH:

24 Q    When that transaction was all over and done with, there

25 were net proceeds to be disbursed out of the escrow of the

117

1  lowly sum of $5,124.82, correct?

2  A    Yes.

3  Q    And that money went to Randy Johnson, didn't it?

4  A    I don't know.

5  Q    Well now, what would this document tell you in answer

6  to that question?

7  A    It doesn't give a definitive answer.

8  Q    The document, the closing statement, doesn't it

9  indicate that that's money that would be due to Randy

10 Johnson?

11 A    Yes.

12 Q    Okay.  And have you seen a check from the escrow

13 company disbursing that $5,000?

14 A    No.

15 Q    You didn't get it in the documentation that was

16 subpoenaed from that escrow company?

17 A    No.

18 Q    Have you asked anybody for a copy of that check?

19 A    Me, meaning the Trustee, yes.  That information has

20 been requested from the Debtor by the Trustee.

21 Q    Well now, we're talking about the escrow company.  I

22 don't know if the Debtor would have a copy of that check,

23 would he?

24 A    I don't know.

25 Q    Well, normally, where would you go to try to get a copy

*Briggs Reporting Company, Inc.*

118

1 of a check issued by the escrow company?

2 A    Normally, if I'm going an investigation which involves

3 an individual, I would ask the individual for a copy of the

4 check.

5 Q    You wouldn't go to the person who issued the check?

6 A    Not normally, unless there were some other indications

7 of problems.

8 Q    Well -- and so, if you went to the Debtor and he said,

9 I won't give it to you or I don't have it, then you could

10 just always go back to the person who issued the check,

11 right?

12 A    That's correct.

13 Q    And in this case, you didn't get the check from the

14 Debtor, right?

15 A    No.

16 Q    No, you didn't get it or --

17 A    No, I did not get the check from the Debtor.

18 Q    Okay.  Did you go back to the escrow company and ask

19 them for a copy?

20 A    No.

21 Q    It would have been important to know to whom the

22 proceeds were given from the sale of the property, wouldn't

23 it?

24 A    Not really that important.

25 Q    Wouldn't that help indicate who it was that was really

*Briggs Reporting Company, Inc.*

119

1  the buyer of the property?

2  A    Not really in this case, no.

3  Q    "Not really in this case" because you already had your

4  mind made up?

5  A    No.  It's because I have a similar example of an escrow

6  closing statement with the disbursement shown to the --

7  Randy Johnson.  And then subsequent to that, I have that

8  check also being transferred back to the Debtor, Jay

9  Johnson.  This could be a very similar instance to that, and

10  things that I had discovered before.

11  Q    Well now, the instance that you were referring to

12  before was that the escrow company cut a check payable to

13  Randy or Robin Johnson for about $1,600.  And then

14  subsequently, you saw a check cut by Robin Johnson to Jay

15  Johnson for approximately the same amount, not exactly,

16  right?

17  A    That's incorrect.

18  Q    What is incorrect about it?

19  A    The amounts.

20  Q    Were they exactly the same?

21  A    The amounts that you stated, I don't know anything

22  about those amounts.  I've never seen anything concerning

23  those amounts that you gave me, so that's why I answered,

24  no.

25  Q    You're being very cute, Mr. Lapides.

120

1          MR. HINDS:  Is that a compliment, your Honor?

2          MR. MCCULLOUGH:  Hardly.

3          MR. HINDS:  Well, then I'd like Mr. McCullough to

4    ask a question.

5          THE COURT:  This is going to go on a lot quicker

6    if we just ask questions.

7    BY MR. MCCULLOUGH:

8    Q    Do you remember how much the check was that the escrow

9    company issued?

10   A    Yes.

11   Q    How much?

12   A    One-thousand-thirty-five dollars.

13   Q    And  how much was the check that Robin Johnson issued?

14   A    One-thousand-thirty-five dollars.

15   Q    So they were exactly the same amount?

16   A    Yes.

17   Q    Now this was -- I want to make sure we got this

18   straight.  This would be the escrow for the purchase of the

19   Viro Road property in the name of Randy Johnson, and when it

20   closed there was the check issued for $1,000 -- or $1,035?

21   A    Yes.

22   Q    And then a short time after that, there was a check

23   issued by Robin Johnson for $1,035 payable to Jay?

24   A    I would like to correct my testimony.  I now recall it

25   was 1,035 and some odd cents.  And the check from the Randy

121

1  and Robin Johnson to the Debtors was 1,035 and the same some

2  odd cents.  So I'm correctly my testimony because I just

3  recalled that just now.

4  Q    Okay.  So the correction was just that there was a

5  certain amount of cents?

6  A    Correct, yes.

7  Q    Okay.  I'm -- thank you.

8       And I'm sure we're both looking for the copies of the

9  checks.  If you find them first, please let me know.

10  A    I found it first.  I mean, I found it.

11  Q    How do you know I didn't find it first?  All right.

12  A    I thought your question implied that you hadn't found

13  it yet.

14  Q    Okay.  I hadn't.  You found it first.  Which one did

15  you find?

16  A    Shall I tell you where it's at?

17  Q    Just the exhibit number.

18  A    T-36 (sic) for 1,067.35.

19  Q    Okay.  T-36.  You don't know which of our exhibits

20  numbers that is?

21  A    I believe it was in bulk, included with about 20 other

22  exhibits.  So this is the only one that I -- this is the

23  individual one in Exhibit, as I said, 36 of the T exhibits.

24  Q    36.  I think I have that here.  Actually, we don't have

25  a T-36 here.  We go from T-35 to T-37 it looks like.  How

122

1  about T-35, page 161 --

2  A    That's correct.  I made a mistake.  Apparently, there

3  is no 36.  So, yes, it's on page 161.

4  Q    Okay.

5        MR. MCCULLOUGH:  Do you know which one that is on

6  our exhibit list?  Let's see.

7        While I'm looking for that one, Mr. Lapides, maybe

8  you can find the one from the escrow company for me, too.

9        THE WITNESS:  That's shown -- should I help you?

10       MR. MCCULLOUGH:  Sure.

11       THE WITNESS:  That's found in the Viro Road

12  property purchase escrow statement.  I don't know the

13  exhibit number right now.

14       MS. KEITH:  That's Exhibit 14.  Yeah.

15  BY MR. MCCULLOUGH:

16  Q    So you have found both checks?  You found the check

17  issued by the escrow company?

18  A    No.

19  Q    I'm sorry.

20  A    I have the escrow closing statement.  It was a Viro

21  Road property purchase escrow closing statement --

22  Q    Okay.

23  A    -- from 1995.

24  Q    Okay.

25  A    That's where I received that number --

123

1 Q    Okay.

2 A    -- I got that number.

3 Q    Okay.  I think that's right.  Okay.  And we don't, at

4 the moment, we don't know what our exhibit number is for

5 that, do we?

6 A    If you give me a moment, I could find it.  Do you want

7 me to look?

8 Q    Yeah.  I want to find it in the trial exhibits so we

9 can put it on the screen.

10 A    If you give me a moment, I'll find it.

11 Q    Okay.  Thank you.  Gee, that was Inter Valley, wasn't

12 it?

13 A    I believe I found it.  Just give me one more second.  I

14 believe it's in T-245, but I have referenced that in T-245

15 and I'm going to pull it just to be sure.  T-245.  That is

16 correct.  It is T-245.

17          MS. KEITH:  You don't have a T-245?

18          MR. MCCULLOUGH:  Exhibit 209, I believe.  Yes.

19 All right.  Let's put on the screen Exhibit 209.  And it

20 will probably be the second page I would assume here.

21          THE WITNESS:  It was on the first page.

22          MR. MCCULLOUGH:  "First page."

23          THE WITNESS:  Excuse me.  I'm sorry to speak out.

24          MR. MCCULLOUGH:  First page.  And since I can't

25 read quite that far.  209.

*Briggs Reporting Company, Inc.*

124

1              Okay.  At the bottom there, can you highlight

2 that?

3 BY MR. MCCULLOUGH:

4 Q     So we see a sum of $1,067.35, and that was the refund

5 from the escrow to the Johnsons, you believe?

6 A     To Randy and Robin Johnson.

7 Q     Now, it doesn't say here to Randy and Robin Johnson?

8 A     No.

9 Q     But it's -- but that would be what the statement

10 reflects it should be the case?

11 A     Yes.

12 Q     And you've seen the check?

13 A     No.

14 Q     How do you know it's payable to Randy and Robin

15 Johnson?

16 A     Based upon the one-page document that you just put in

17 front of me.

18 Q     So, based upon the closing statement and your

19 understanding of escrows, there should be a check from the

20 escrow company for $1,067.35?

21 A     Yes.  There should be a check issued --

22 Q     And if you wanted --

23 A     -- for 1,067.35.

24 Q     -- and if you wanted to see that check, you'd go to the

25 escrow company?

125

1  A    That's -- yes, I could do that.  I mean, that's one

2  thing you could do.

3  Q    All right.  Your first person to go to would be Randy

4  and Robin Johnson, the supposed payees of the check?

5  A    I think I'd ask them first.  Yes.  Excuse me.

6  Q    Okay.  And if they didn't have it, for some reason they

7  didn't keep a copy, because once they get the check, they

8  deposited in the bank, right?

9  A    That's possible.

10 Q    Well, if the want to get the money, don't they have to

11 deposit the check or cash it someplace?

12 A    Yes.

13 Q    And then if they go to a bank and they deposit it or

14 they cash it, the bank's going to keep the check and send it

15 off to the bank for payment, aren't they?

16 A    Yes.

17 Q    Okay.  So, it's highly unlikely that the Johnsons would

18 have had the original check, right?

19 A    No.

20 Q    After depositing or cashing the check, it's highly

21 unlikely that they would have had the original check,

22 correct?

23 A    That is correct, your second question.

24 Q    So is my first, because that's what I asked.  But the

25 point is, once they get the check, if they want the money,

*Briggs Reporting Company, Inc.*

126

1 they have to cash it or deposit it.  And once they do that,

2 they lose possession of the original check, correct?

3 A    Not necessarily.

4 Q    You mean the bank's going to give it back to them?

5 A    If you're asking what I mean, I mean when someone gets

6 a check from an escrow company, I make a copy of it and put

7 in a file.

8 Q    Well, Mr. Lapides, listen to my question, please.  The

9 original check, they're going to give to the bank when they

10 deposit it or cash it, correct?

11 A    Yes.

12 Q    And then the bank is going to send the check to the

13 bank that it's drawn on for payment, right?

14 A    Of course.

15 Q    And so the original check's not going to be left in the

16 hands of the Johnsons, correct?

17 A    Yes.

18 Q    Now, if the Johnsons, in this case, Randy and Robin

19 Johnson, made a copy of the check, then you might ask them

20 if they have a copy, correct?

21 A    Yes.

22 Q    And if they don't have a copy, you've got to go the

23 bank and ask them for the, either the original check or a

24 copy of the check, right?

25 A    Yes.

127

1  Q    Okay.  And how much was this check, 1,067.35.  That's

2  not quite the number you gave us a moment ago though, was

3  it?

4  A    I was mistaken and --

5  Q    Yes, you were.  Okay.

6  A    -- it should have been 1,067.35.  I was mistaken, and

7  this is the correct number.

8  Q    Okay.  Now, I think you said you also found the check

9  that Robin Johnson wrote?

10  A    Yes.

11  Q    And do we know which trial exhibit number that one is?

12  A    It's T-35, page 161.

13         MR. HINDS:  19.

14         MR. MCCULLOUGH:  "19"?  Okay.

15  BY MR. MCCULLOUGH:

16  Q    Let's look at Exhibit 19.  We're putting it up on the

17  screen.  Blow that up.  And --

18         MS. KEITH:  I don't think that's right.  That's

19  not right.

20  BY MR. MCCULLOUGH:

21  Q    This is -- okay.  Exhibit 19.  Okay.  Exhibit 19, page

22  two.

23  A    We need a step chair.

24  Q    So this is a check -- this is the check you were

25  referring to that went back from Robin Johnson to Jay

128

1  Johnson, right?

2  A    Yes.

3  Q    Same amount?

4  A    Yes.  Exactly.

5  Q    Very good.  Very good.  Okay.  Your memory seems to be

6  very good today.  Do you know where those checks are in your

7  exhibits that we said were missing yesterday?

8  A    I don't recall what you're talking about.

9  Q    I'm sure you do.  Let me refresh your recollection.

10 Remember, we were going through a series of checks

11 yesterday.

12 A    Yes.  Yes.  I remember now.

13 Q    Okay.  And we asked you where they were and you said

14 you didn't know.  Do you remember that?

15 A    I don't -- I might have said that.

16 Q    Okay.  Let's --

17 A    I do have the recollection of those checks.

18 Q    Okay.  There's no question pending.

19        MR. MCCULLOUGH:  Now, if we could go back to our

20 last exhibit, which was Exhibit 29.002, and highlight the

21 bottom part there.  Okay.

22 BY MR. MCCULLOUGH:

23 Q    Net proceeds, $5,124.82.  That would indicate that the

24 remaining proceeds from the escrow would be going to whom in

25 this case?

129

1  A    It would go to whoever Randy instructed it to go to.

2  Q    The document itself would indicate that the proceeds

3  went to whom?

4  A    The document doesn't show who it went to.

5  Q    Did the original -- did the closing statement on the

6  original purchase of the property by Randy Johnson, did that

7  closing statement indicate to whom the $1,067.35 check was

8  going to?

9  A    No.

10  Q    But you assumed it went to Randy and Robin Johnson?

11  A    It could have gone to Randy and Robin Johnson, or

12  whoever Randy and Robin Johnson instructed it to go to.

13  Under normal circumstances it would have gone to Randy and

14  Robin Johnson.

15  Q    "Under normal circumstances," to whom would this $5,000

16  check go to?

17  A    Under normal circumstances, it would have gone to Randy

18  Johnson.

19  Q    Okay.  Do you have any evidence that the $5,000 check

20  did not go to Randy Johnson?

21  A    Yes.

22  Q    Have you seen a copy of the check?

23  A    No.

24  Q    Do you know who it was payable to?

25  A    No.

130

1  Q    Do you know where it was deposited?

2  A    No.

3  Q    So you don't know who it was payable to, you don't know

4  where it was deposited.  Do you know if it went to Randy

5  Johnson?

6  A    No.

7  Q    It's your opinion it went someplace else?

8  A    No.

9  Q    Do you have an opinion as to where the $5,000 went?

10  A    Yes.

11  Q    Do you have an opinion as to where the $5,000 went

12  initially from the escrow company?

13  A    Yes.

14  Q    Where?

15  A    My opinion, it went to whoever Randy Johnson instructed

16  it to go to.

17  Q    Do you have any evidence as to whom Randy Johnson

18  instructed it to go to?

19  A    No.

20  Q    So, it would be pure speculation on your part to guess

21  where it went, right?

22  A    I don't know where it went.  I admitted that.

23  Q    Okay.  I just want to make sure.  You don't have any

24  idea where it went?

25  A    No, I don't know.

131

1  Q    But normally it would have gone to Randy Johnson?

2  A    "Normally it would have gone to Randy Johnson," yes.

3  Q    And you don't have any evidence that it went anywhere

4  else, do you?

5  A    Incorrect.

6  Q    Well, what evidence do you have that it didn't go to

7  Randy Johnson?

8  A    Evidence we've been discussing for the last 15 minutes.

9  The Viro purchase showing a disbursement of 1,067.35, and

10 the check from Randy going to Jay Johnson for 1,067.35.

11 That's the evidence I have.

12 Q    I see.  So what you're saying is that since it was a

13 fraud in the beginning, and they got the $1,000 that

14 eventually went to Jay, the same thing must have happened

15 when the sale to Mike McFall took place.  The $5,000 went

16 back to Jay?

17 A    No.

18 Q    You don't know where it went, right?

19 A    I believe I've said that.  I don't know where it went.

20 Q    So, if you don't know where it went, you don't know

21 where it went.  Do you have an opinion other than that?

22 A    Yes.

23 Q    And what is that?

24 A    That it would have come back around to the Debtor, Jay

25 and Debra Johnson, the Debtors, in some way, shape or form.

132

1  Q    That's pure speculation on your part, isn't it?

2  A    No.

3  Q    All right.  Let's move along.  Let's go to Exhibit 68.

4  Okay.  Do you have 68?

5  A    No.

6  Q    I'm sorry.

7  A    What -- you didn't tell me.  If you want me to pull

8  something out, tell me what it is again, please, and I'll be

9  glad to do it.

10 Q    I'm -- we've got Exhibit 68 here on the screen.  If

11 that's sufficient, that will save you time finding it.  But

12 if you wish to look at it, you know, please do.

13 A    Did you say 68?

14 Q    "68."

15 A    I have it.

16 Q    Okay.  What is Exhibit 68?

17 A    It's an escrow closing statement for Randy Johnson's

18 loan on the Viro Road property from Michael McFall's

19 company.  It was deposited to the Key Financial Bank

20 account.

21 Q    You just jumped right, all through everything, didn't

22 you?  You know this transaction perfectly, right?

23 A    No.

24 Q    It sounded pretty good.  Let's see if we can just

25 follow this a little bit more slowly so I understand it.

133

1  First of all, this is the borrower's final settlement

2  statement, right?

3  A    Yes.

4  Q    Now, this isn't for the purchase of the Viro Road

5  property, is it?

6  A    No.

7  Q    So there's no loan being made here to buy the property,

8  correct?

9  A    Correct.  Yes.

10 Q    And -- but there was, the 4600 Viro Road property was

11 in some fashion involved in this transaction, right?

12 A    Yes.

13 Q    And who was the borrower?

14 A    Randy.

15 Q    Okay.  And how much was being borrowed?

16 A    Five-hundred-thousand even.

17 Q    And then the loan was going to secured, correct?

18 A    Yes.

19 Q    By a second deed of trust on the Viro Road property?

20 A    Yes, I believe that was the case.

21 Q    And was there a draw being made against this loan?

22 A    Yes.

23 Q    How much?

24 A    As shown on this statement in front of us, $350,000.

25 Q    And the closing date?

134

1  A      June 8, 2000.

2  Q      That was a fairly auspicious date in this case, wasn't

3  it?

4  A      I don't know what you mean.

5  Q      June 8th, 2000 was the date of the agreement between

6  you and Jay upon which you base your claim in this

7  bankruptcy, isn't it?

8  A      If you mean between me and Debtor, Jay Johnson, and the

9  Debtor's 100-percent owned business, A.i.a, the answer would

10 be, yes.

11 Q      Let's see.  You said the Debtors 100-percent owned

12 A.i.a?  Are you aware of Debra Johnson having any ownership

13 of stock in A.i.a?  I mean, apparently, you ought to be --

14 A      No.

15 Q      Okay.  So -- I mean, you sound like you want to be very

16 particular, 100-percent owned and so forth, instead of just

17 saying, Jay's company.  Who owned the stock?

18 A      From the documents I saw, Jay was the 100-percent

19 owner.

20 Q      Okay.  And so Debbie didn't own any of the stock,

21 right?

22 A      Not as far as I knew.

23 Q      Okay.  On this Exhibit 68, does it tell us who the

24 lender is?

25 A      No.

135

1  Q    You just knew that from some other documents, right?

2  A    I knew that from the escrow file that we subpoenaed.

3  Q    Okay.  Let's go to Exhibit 69.  What is this document?

4  A    This was part of the subpoenaed documents from the

5  escrow company.

6  Q    Yes.  But what is this particular document?

7  A    A $500,000 note.

8  Q    And it's date?

9  A    June 5, 2000.

10  Q    And does it indicate the initial draw?

11  A    Yes.

12  Q    And how much was it?

13  A    Three-hundred-and-fifty-thousand dollars even.

14  Q    And does it indicate how much the total line of credit

15  was?

16  A    Yes.

17  Q    How much?

18  A    Five-hundred-thousand dollars.

19  Q    And does it indicate who the lender is?

20  A    Yes.

21  Q    And who is that?

22  A    Fame 10 Productions, LLC.

23  Q    Okay.  Now, I know throughout all the documents I've

24  ever seen in this case where you and the Trustee have

25  referred to this loan, it's always been Fame 10.  What does

136

1 is this document say is the lender?

2 A    This document refers to the lender, Fame 10

3 Productions, LLC.

4              MR. MCCULLOUGH:  Let's see.  Could we blow up this

5 from right here?

6 BY MR. MCCULLOUGH:

7 Q    Are you reading here where it says, "Frame 10

8 Productions"?

9 A    Yes.

10 Q    Can you pronounce frame for me?

11 A    Frame 10 Productions, LLC.

12 Q    Okay.  Not fame, but frame, right?

13 A    Yes.

14 Q    Okay.  Does this note indicate what the interest rate

15 is going to be?

16 A    Yes.

17 Q    And what is the interest rate?

18 A    Thirteen-percent per annum.

19 Q    And what is the due date?

20 A    It's not completely filled in.  It says, "June," and

21 there's a blank, which would normally have been a date, and

22 then the year 2005.

23 Q    Who signed this note?

24 A    Randy.

25 Q    So, Randy is the borrower, correct?

137

1  A    Yes.

2  Q    And Randy is the one who is obligated to -- well, first

3  of all, Randy is the one permitted to withdraw -- to draw

4  down on the line of credit, right?

5  A    I would assume so.  I haven't seen the documents

6  related to that.  But your assumption is normal.

7  Q    Well, this is a line of credit, isn't it?

8  A    Yes.

9  Q    And people draw down on lines of credit, don't they?

10  A    Yes.

11  Q    And usually it's the borrower who is permitted to drawn

12  down on the line of credit, correct?

13  A    Sometimes.

14  Q    Is there any question in your mind that Randy Johnson

15  is the one and only person authorized to drawn down on this

16  note?

17  A    I don't know that.  That's -- I don't know that.

18  Q    Have you -- well, according to this document, would

19  Randy Johnson be a person entitled to drawn down on the line

20  of credit?

21  A    This document doesn't say one way or the other.

22  Q    But normally it would be the borrower who is authorized

23  to draw down on the line of credit?

24  A    Normally, the borrower would be included in the

25  authorized individuals.

138

1          MR. MCCULLOUGH:  If we could blow up the bottom

2  portion of the screen there with his signature.

3  BY MR. MCCULLOUGH:

4  Q    Who is obligated to repay this note?

5  A    Randy.

6  Q    And who is going to be responsible for breaching the

7  note and not paying it if it's not paid?

8  A    From this one document, I would say Randy.

9  Q    All right.  Have you seen any document anywhere at any

10 time at any place which indicates that somebody other than

11 Randy Johnson is obligated on this note?

12 A    Not on this note, no.

13          MR. MCCULLOUGH:  If we could go to the second page

14 of this note.  And if we could just highlight the very

15 bottom.

16 BY MR. MCCULLOUGH:

17 Q    And do you recognize who has signed the approval as to

18 form and content of this note?

19 A    Yes.

20 Q    Who?

21 A    Michael McFall.

22 Q    Co-conspirator, right?

23 A    What's your question?

24 Q    Michael McFall's a co-conspirator with Randy and Jay,

25 correct?

*Briggs Reporting Company, Inc.*

139

1  A    There's every indication that your statement is

2  accurate.

3  Q    And is it your opinion that he is a co-conspirator?

4  A    As I said, there's every indication that that is the

5  truth.

6  Q    Okay.  But is that your opinion?

7  A    Yes.

8  Q    In fact, it's your opinion that Michael McFall is a

9  criminal co-conspirator, correct?

10  A    I'm not a lawyer.  I can't make that -- I can't say.

11  Q    Perhaps, but you have said it, haven't you?

12  A    I'm not a lawyer.  I can't assess the criminal

13  liability against anybody.

14  Q    I just asked you if you -- if it wasn't true that you

15  had referred to him as a criminal conspirator -- criminal

16  co-conspirator?

17  A    I don't recall that.

18  Q    Let's go to Exhibit 70, please.  And do you know what

19  this document is?

20  A    Yes.

21  Q    What is it?

22  A    It appears to be an uncashed check for $348,207.

23  Q    You say "it appears to be an uncashed check"?

24  A    Yes.

25  Q    How about a non-negotiable copy of the check?

140

1  A     That means the same thing to me.

2  Q     Well, but then you're not a banker, right?

3  A     Right.

4  Q     In looking at this document, you do see where it says,

5  "non-negotiable"?

6  A     Yes.

7  Q     That would mean that this piece of paper -- well, not

8  this copy that we have in front of us, but the original, if

9  it's stamped non-negotiable, you couldn't cash that

10 anywhere, could you?

11 A     As you said, I'm not a banker, but I wouldn't think so.

12 Q     All right.  So this would be like maybe a carbon copy

13 of the check on top, which would be the check that would be

14 negotiated, right?

15 A     That sounds reasonable to me.

16 Q     All right.  And to whom is the check payable?

17 A     Imperial Bank.

18 Q     And does this have anything to do with our Frame 10

19 note?

20 A     Yes.

21 Q     And what is that, what is the connection?

22 A     This is the amount of the initial draw of the $500,000

23 line of credit.

24 Q     And by issuing this check, what is Huey Escrow Company

25 doing?  When you say there's a connection between the two,

141

1  it's the initial draw.  They're not paying it to Randy,

2  they're paying it to Imperial Bank.  What's the connection?

3  A    I don't know.  There's an account number on there I

4  don't recognize.

5  Q    Well, let's go to the next document, or the next page

6  of Exhibit 70.  Do you know what this document is?

7  A    Yes.

8  Q    And what is it?

9  A    An escrow company status report.

10 Q    And what is it telling us?

11 A    What it says on the statement is what it's saying.

12 Q    Well, tell me in a few words.  What is this document

13 telling us?

14 A    There's a credit of $350,000, a debit of $348,207,

15 another debit of 114.43, and another debit of $350.

16 Q    Okay.  Do you --

17 A    With a balance of zero.

18 Q    -- do you have any idea what that means?  You've read

19 the information.  Do you know what it means?

20 A    Yes.

21 Q    What?

22 A    It's an escrow company status report.

23 Q    Okay.  Let's go to the third page, please.  Do you know

24 what this document is?

25 A    Yes.

142

1  Q    And what is it?

2  A    It's as it's stated on the statement.  It says it's a

3  "new wire transfer notice."

4  Q    And does this have something to do with the transfer of

5  funds?

6  A    Yes.

7  Q    A wire transfer of funds?

8  A    Yes.

9  Q    From whom?

10 A    I don't see it identified where it's from.  I see it's

11 identified to it's to, but not from.

12 Q    How about Huey Escrow Company, would that be the entity

13 that is wire transferring the funds?

14 A    No.

15 Q    How about Imperial Bank?

16 A    I don't know.  Like I said, it's not stated on the

17 statement you showed me.

18 Q    Okay.  In the upper, left-hand corner it says,

19 "Imperial Bank," doesn't it?

20 A    Yes.

21 Q    Would that indicate to you that Imperial Bank is

22 conducting a wire transfer of funds?

23 A    It could mean that.

24 Q    Let's assume for a moment that it does.  They're wire

25 transferring how much?

143

1  A    Three-hundred-and-forty-eight-thousand-two-hundred-and-

2  seven dollars even.

3  Q    Okay.  And are they wire transferring that fund to --

4  or that amount to another bank?

5  A    Yes.

6  Q    And who -- what bank is that?

7  A    Wells Fargo, S.F.  Wells Fargo Bank, N.A.

8  Q    And does the instruction here indicate who is the

9  beneficiary of the wire transfer?

10 A    Yes.

11 Q    And who is that?

12 A    Q Financial Group, LLC, 466 Foothill Boulevard, Number

13 340, La Canada, California 91011.

14 Q    So, is it true that the upshot of the documents we've

15 seen so far is that Randy signed a note for $500,000.  He

16 made a draw of $350,000, and instructed the escrow company

17 to have that money wire transferred to Q Financial?

18 A    Yes, that's exactly -- yes.

19 Q    That's exactly what happened, right?

20 A    That appears to be exactly what happened.

21 Q    Okay.  Good.  Now you didn't see Jay Johnson's name

22 anywhere on these documents, did you?

23 A    No.

24 Q    Jay Johnson didn't sign the note?

25 A    No.

144

1  Q    So he's not liable to pay the note back, is he?

2  A    I don't know.

3  Q    Well, who is the person liable to pay a promissory

4  note?

5  A    It's typically the person that signs them, unless

6  there's another agreement outside of the escrow or a

7  transaction.

8  Q    Okay.  Do you know they call the person who signs the

9  promissory note?

10 A    He's the obligator.  He's obligated to pay the money.

11 Q    Okay.  Have you heard of the term, "maker of the note"?

12 A    Yes.

13 Q    Okay.  So, let's use that term.  So the maker of the

14 note here would be Randy Johnson, correct?

15 A    Yes.

16 Q    And isn't it true that the maker of the note is

17 generally the person who is obligated to pay it back?

18 A    Like I said, yes, that's true generally, unless there's

19 an outside agreement between the parties.

20 Q    Do you know what you call these outside agreements

21 generally?

22 A    I call them "agreements."

23 Q    Did you ever hear of the term, "guarantee"?

24 A    I've heard that word before, too.

25 Q    All right.  If a maker signs a note and somebody else

145

1  guarantees the payment, we'd call that person a guarantor,

2  wouldn't we?

3  A     I'm not sure.

4  Q     Okay.  Have you ever seen a guarantee document in which

5  somebody guaranteed Randy's debt to Frame 10 for the

6  $500,000?

7  A     No.

8  Q     Have you seen any written agreement at all which

9  obligated Jay Johnson to pay the debt to Frame 10 on the

10 note that Randy Johnson signed?

11 A     No written agreement, no.

12 Q     Are you aware of an oral agreement by which Jay is

13 obligated to pay the Frame 10 note?

14 A     I don't know of an oral agreement.  I know there are

15 indications suggesting cooperation between Jay and Randy in

16 this endeavor.

17 Q     There's always a little conspiracy going on between the

18 two of them on every transaction that you've seen, right?

19 A     Give me a moment.  I'm trying to think if it's on every

20 one.  No.  I didn't find fraud in every transaction that

21 Randy Johnson was involved in.

22 Q     Let's just go to Exhibit 71 for a moment, please.  Do

23 you know what Exhibit 71 is?

24 A     Yes.

25 Q     What is it?

146

1  A    As it's stated, it's the short form deed of trust with

2  assignment of rents.

3  Q    And what's the date of the deed of trust?

4  A    June 5, 2000.

5  Q    And who signed the deed of trust?

6  A    Randy.

7         MR. MCCULLOUGH:  And if we could, on the first

8  page, if we could highlight this person right here.

9  BY MR. MCCULLOUGH:

10  Q    On the first page of the deed of trust it says, "Randal

11  Allan Johnson, a married man, as his sole and separate

12  property," and then it goes on.  Do you see that?

13  A    Yes.

14  Q    Do you know what "sole" means?

15  A    Yes.

16  Q    What?

17  A    His individual, to exclude his wife.

18  Q    Sole only excludes wives?

19  A    No.

20  Q    Sole excludes everybody else, doesn't it?

21  A    Yes.

22  Q    Sort of like if a managing member of an LLC signs it

23  sole member, that excludes everybody else that's a member.

24  It's him alone, right?

25  A    Under normal circumstances, the answer would be, yes.

147

1 Q    But in this case, Steven Nelson (phonetic), when he

2 signed the 8,000-M, LLC (phonetic) documents there that said

3 he was the sole member, he was lying, right?

4 A    Are we skipping from this to something else now?

5 Q    Just answer the question.

6 A    Okay.  I lost track because I was looking at this

7 document.  Could you repeat the question?

8 Q    I surely can.  We were talking about Randy signing this

9 as his sole and separate property, and we talked about how

10 you would define sole.  And we agreed, I think, that the

11 word sole would exclude not only wives but everybody else,

12 right?

13 A    That's typically the -- correct, yes.

14 Q    Well, that's sort of the definition of the word sole,

15 isn't it?  Alone, single, nobody else?

16 A    Sure.  That's the definition.

17 Q    Okay.  All right.  And Steven Nelson, when he signed

18 for 8,000-M, LLC, and buying the Fallbrook property, signed

19 it, sole member of 8,000-M, LLC, correct?

20         MR. HINDS:  Objection --

21         THE WITNESS:  Well, someone wrote in under his

22 name.

23         THE COURT:  Hold on.  What?

24         MR. HINDS:  We plowed this field a day ago.  I

25 think we killed every tree around it.  Do we have to go over

148

1  it again?

2        MR. MCCULLOUGH:  I think in light of the testimony

3  of the witness with respect to the word "sole" here, we can

4  go back to the document he testified about yesterday when we

5  said, "sole member," and he came up with some

6  incomprehensible meaning that said it could include others.

7  I just want to ask him if he thinks there's  different

8  interpretation of the word for that transaction.

9        MR. HINDS:  Your Honor, we're never made any

10  progress if we keep going back over things that we've

11  covered.

12        THE COURT:  Sustained.

13  BY MR. MCCULLOUGH:

14  Q    Okay.  To wrap this subject up, the $350,000, less some

15  little fee in there, the proceeds of the loan made by Frame

16  10, we've now traced from Frame 10 through the escrow by

17  wire transfer to Q Financial, correct?

18  A    Yes.

19  Q    That hasn't stopped anywhere in between, has it?

20  A    Not that I know of.

21  Q    It hasn't gone to Jay Johnson, has it?

22  A    Not yet.

23  Q    "Not yet."  But in your opinion, it did eventually go

24  to Jay Johnson?

25  A    That wasn't my opinion.

149

1  Q    Well, what did you mean by "not yet"?

2  A    I meant in the course of my investigation I discovered

3  a significant amount of money from this $350,000 going to

4  the benefit of Jay Johnson, and I documented that in my

5  trial declaration.  That's what I meant.

6  Q    Okay.  I'd like to go to a different subject.  If we

7  could go to your report, Exhibit 227, page two.

8  A    Could you tell me which report?  That's report number

9  one, right?

10  Q    Yes.

11  A    I have it.  I mean, tell me what page.

12  Q    Page two.

13  A    I'm there.

14        MR. MCCULLOUGH:  And if we could have the young

15  lady here highlight this part right here, please.

16  BY MR. MCCULLOUGH:

17  Q    In the table of contents to your report, you have a

18  section six, vi, six, in which you say, "brief examples of

19  the bankruptcy fraud."  Do you see that?

20  A    Yes.

21  Q    And then you use the word fraud in that table of

22  contents?

23  A    I did, yes.

24  Q    And you really meant fraud, didn't you?

25  A    Yes.

150

1  Q    And then you list several, quote, "examples of the

2  bankruptcy fraud."  Let's go down to eight, and you identify

3  a $10,000 fraudulent rent check issued by Jj & A, correct?

4  A    Yes.

5  Q    In as much as you in your table of contents have

6  identified that transaction as, you know, being one of these

7  examples of bankruptcy fraud, I would assume that that means

8  that it's a pretty significant transaction?

9  A    No, no.  No, I wouldn't say that.  I'd say this is a

10 brief example.

11 Q    "A brief example"?

12 A    Yes.  It only involves one document.

13 Q    Is this a minor fraud, a major fraud?

14 A    It was a brief example.  It involves only one document.

15 Q    But it merited being included in your table of contents

16 as an example of bankruptcy fraud?

17 A    Yes.  It was a brief example of a bankruptcy fraud.

18 Q    Let's go to page 75 of your report.

19        MR. MCCULLOUGH:  And if we could highlight this

20 middle paragraph, please.

21 BY MR. MCCULLOUGH:

22 Q    In your report, you start off this section saying, "Jj

23 & A issues $10,000 check for Jay's rent."  And then you say,

24 "as previously noted and discussed."  Now I'm on page 75,

25 and you had mentioned this particular fraudulent transaction

1  earlier, right?

2  A     If you give me a second, I'll answer that.

3  Q     You can't answer it because -- where you said

4  previously noted and discussed?

5  A     Do you want me to confirm if I did it previously or

6  not?

7  Q     Well, were you accurate in your report when you said

8  that it was previously noted and discussed?

9  A     "It was previously noted and discussed" somewhere.  If

10 it was in this report I could tell you in a few minutes if

11 you give me the time.

12 Q     Well, if it wasn't in this report, are you referring to

13 something else?

14 A     I don't know.

15 Q     Okay.

16 A     I'd have to take a few minutes to check it out.

17 Q     Well, we'll check it out later.  You also discussed it

18 subsequently in your report, didn't you?

19 A     I'm not sure.  I could very well have.

20 Q     Is your memory fading on this issue?

21 A     No.  I wrote about four- or 500 pages in a report.  I

22 don't remember every specific page.  And it involved 3,000

23 exhibits.  I don't remember every single page off the top of

24 my head.

25 Q     Okay.  Let's go on.

152

1              "As previously noted and discussed,

2          Jj & A issued a check on December 30th,

3          2002 to Randal Johnson for $10,000, with

4          a memo stating Viro rent."

5      You go on and you say, "as previously mentioned."  In

6  your report do you think?

7  A    It could have been.  It could have been somewhere else.

8  Q    "As previously mentioned, this check suggests that the

9  Jj & A account belonged to Jay Johnson."  That was one of

10 the conclusions you came to, correct, that it suggested the

11 account belonged to Jay Johnson?

12 A    I didn't say that.  I said, "this suggests."

13 Q    That's what I just --

14 A    And that's what I meant.

15 Q    -- that's what I --

16 A    You just said, you concluded.

17 Q    Yes.  You concluded that this suggests that Jj & A was

18 an account belonging to Jay Johnson, correct?

19 A    Yes, correct.

20 Q    Okay.  Then you go on, you say:

21             "This check also raises the

22          question, if Jj & A were really Randy

23          Johnson's bank account, how could the

24          account be used to pay rent to himself?"

25     Sounds like a legitimate question, right?

153

1  A     It did to me.

2  Q          "Furthermore, this check was also

3         deducted as a business expense under the

4         category 'independent consultant' and an

5         I.R.S. form 1099 was issued to Randal

6         Johnson showing that this $10,000 was

7         paid to Randal Johnson from Jj & A

8         Architects, Inc. for non-employee

9         compensation..."

10     That was something else that you noted, right?

11 A     Yes.

12 Q     You say:

13          "...Finally, what is really most

14         interesting is that Jay Johnson was

15         already paying the entire first trust

16         deed mortgage payment on 4600 Viro Road,

17         as well as the entire second trust deed

18         mortgage payment on 4600 Viro Road, for

19         each and every month from December 2001

20         through June 2003, at which time the

21         property was sold to Michael Bernstein

22         from Michael McFall..."

23     for a certain amount of money.  And then you go on.

24 You say, "Jay never missed a single payment when he was

25 paying the mortgage."  When the property was owned by

154

1  McFall, correct?

2  A    I don't recall.  That could be the case.  If you want

3  me to confirm it I'd have to look it up.  But that could be,

4  very well be the case.

5  Q    Well, you say:

6              "...During this entire time period,

7          from December 2001 through June 2003,

8          Jay Johnson never missed a single 4600

9          Viro Road mortgage payment."

10     You checked it out, you verified it and you wrote it

11  down, right?

12  A    Right.  Yes.

13  Q    Okay.  Now, surprisingly, we continue here.  Here we

14  have a check being issued by Jay Johnson on the Jj & A

15  account to his brother, Randy Johnson, on December 30th,

16  2002 for $10,000, labeled as rent for 4600 Viro Road, where

17  Jay has already paid the mortgage payments from December

18  2001 through June 2003.  And then you reach your final

19  conclusion, saying, "this check just seems to be a very poor

20  and superficial attempt by the Debtor," and you're referring

21  to Jay Johnson?

22  A    Yes.

23  Q    "By the Debtor and his co-conspirator."  Who would that

24  be, Randy?

25  A    Yes.

155

1  Q    "To somehow" --

2  A    And Michael McFall.

3  Q    Okay.  So, we've got Jay and Randy and Michael McFall

4  as co-conspirators in this fraud, right?

5  A    Yes.

6  Q    Okay.  I just want to make sure.

7               "In an attempt by the Debtor and

8          his co-conspirator to somehow try to

9          verify that Jay Johnson was renting 4600

10         Viro Road property from his brother,

11         Randy Johnson."

12     That was a pretty significant item, wasn't it?  Isn't

13 that why you put it in the table of contents, big, bold

14 letters there?  This is a pretty significant item to you to

15 help prove the fraud, right?

16 A    I thought it was very significant, especially since the

17 property wasn't even in Randy Johnson's name at the time.

18 Q    Okay.  Have you ever seen a copy of the $10,000 check?

19 A    No.

20 Q    Have you seen the original check?

21 A    No.

22 Q    Have you seen the check in your mind somehow, to see

23 what it looks like?

24          MR. HINDS:  Objection, argumentative.

25          THE COURT:  Sustained.

156

1  BY MR. MCCULLOUGH:

2  Q    If you haven't seen the check or a copy of the check,

3  how could you possibly know that it was a $10,000 check

4  drawn on Jj & A's account, to Randy Johnson?

5  A    Well, I'm glad you asked that question.

6  Q    You won't be in a minute, but go ahead.  Tell me.

7  First of all, I must remind you that there is a document in

8  this case which has not been authenticated, and you cannot

9  refer to it.  It's not in evidence.  It's been excluded from

10 evidence.  Just keep that in mind when you tell me how you

11 know this check was issued by Jj & A for $10,000 payable to

12 Randy Johnson.

13 A    The Trustee subpoenaed the bank account and financial

14 statements from the Debtor, Jay Johnson and A.i.a's

15 accountants.  And we received the journals and ledgers and

16 financial statements from the Jj & A's accountant.

17 Q    Excuse --

18 A    This ledger showed --

19 Q    I'm going to interrupt.

20       MR. HINDS:  Excuse me, Mr. McCullough.  Can you

21 let the witness finish his statement?

22       THE COURT:  Okay.  Hold it.

23       MR. MCCULLOUGH:  Your Honor --

24       THE COURT:  First of all, was there a question

25 pending?

157

1          THE WITNESS:  Yes.

2          THE COURT:  What was the question?

3          MR. MCCULLOUGH:  I asked him how he knew this, but

4  I --

5          THE COURT:  Okay.  I'm sorry.  I got a little

6  waylaid when you were giving him the admonishment about the

7  document.

8          MR. MCCULLOUGH:  Yeah, I --

9          THE COURT:  Sorry.

10          MR. MCCULLOUGH:  -- I just -- he has now just

11  mentioned the document, and obviously he's going to refer to

12  the document.  And I just want to -- I think that he should

13  not refer to a document that this Court has excluded from

14  evidence.  It was excluded for a particular purpose, because

15  it was not authenticated to be reliable, trustworthy, to

16  accurately reflect the information that it contained.

17          And so all I'm saying is, he can -- he's free to

18  tell me the answer to the question, but he cannot refer to

19  the content of a document that this Court has found has not

20  been authenticated, because we cannot trust it's

21  trustworthiness or its reliability.

22          MR. HINDS:  I guess two observations, your Honor.

23  If Mr. McCullough's going to ask the witness a question,

24  he's going to have to accept what the answer is.  He make

25  take issue with the answer once it's in the record.  He's

158

1 trying to intimidate this witness with all of this colloquy

2 before the answer's even in the record.

3       Second point is, as this Court is well aware,

4 under 701 of the Evidence Code, an expert can refer to

5 things that are in the record, outside of the record, things

6 that were admissible and inadmissible.  I believe, by way of

7 an offer of proof, the witness is going to say the Trustee

8 subpoenaed a document.  The Trustee got a document.  The

9 Trustee shared a document with him, and he relied on it in

10 reaching a conclusion.

11       Now, if that's the testimony, we're just not

12 getting into the admissibility of a particular document.

13 You have ruled that it's not admissible but that doesn't

14 mean the witness, as an expert, can't refer to things that

15 were given to him as part of the discovery in this case.

16 And by the way, not provided by the Defendants who had

17 copies, apparently, of all of this stuff, but apparently

18 elected to withhold it from the Trustee during discovery.

19       THE COURT:  Okay.  So now, I just want to let you

20 know, you're off topic.  Okay.  So, there was an objection

21 made.  I understand the objection.  I think the objection is

22 well taken.   Number one, if you're going to ask him a

23 question and then say, but you can't answer it, that doesn't

24 make sense.  And -- but more importantly, he is testifying

25 as an expert.  As you well know, an expert can rely on

159

1  hearsay, can rely on otherwise inadmissible evidence as a

2  basis for forming their opinion.

3          So, if this is a preemptive motion to strike

4  whatever he's going to say, it will be denied.

5          MR. MCCULLOUGH:  Okay.  Great.

6          MR. HINDS:  So, could we have the witness complete

7  his answer about what he saw to get to this item in his

8  report at page 75, please.

9          THE COURT:  Mr. Lapides.

10          THE WITNESS:  To begin at the beginning, just so I

11  could keep my train of thought.  The Trustee subpoenaed the

12  county --

13          THE COURT:  Okay.  Do you remember the question?

14          THE WITNESS:  How I knew about this 10,000?

15          THE COURT:  Yes.  Let's try to tailor the answer

16  to that.  Because I don't want to go over the whole history

17  of the case --

18          THE WITNESS:  The Trustee --

19          THE COURT:  -- and every single document that

20  wasn't produced.  I just want to know your answer to this

21  question.

22          THE WITNESS:  -- the Trustee received the Jj & A

23  journals, ledgers and financial statements from the Jj & A

24  accountant.  I independently verified approximately 250 to

25  300 entries in that journal and ledger to verify every,

160

1  every one of the of 250-300 items I looked at was exactly --

2  that I had checks for, exactly correlated with the document,

3  therefore, I relied on it.

4         When I looked at the ledger, I saw an entry in the

5  journal for $10,000 made payable to Jay Johnson from Jj & A,

6  for $10,000.  And the memo was recorded as for rent.  And

7  this was at a time --

8         THE COURT:  Okay, okay.

9  BY MR. MCCULLOUGH:

10 Q    So we could be just a little more clear, are you

11 referring to Exhibit 154?

12 A    I'll have to go and see.

13 Q    It is trial Exhibit 154.

14        MR. HINDS:  And for the record, your Honor, is Mr.

15 McCullough now referring to a document that asserted just

16 five minutes ago as inadmissible, can't be referred to,

17 because I'm a little confused --

18        THE COURT:  Well, I just overruled -- I mean, I

19 just sustained your objection.  So now that I've sustained

20 the objection, you can't come back and object to him

21 referring to it.  So what's the objection?

22        MR. HINDS:  The issues of --

23        THE COURT:  No.  No, no.  Let's just stop.  Just

24 stop.  Okay.  Because I've sustained your objection, and so

25 now let the witness testify about the document.  And now

161

1 that he's testifying about the document, you can't prevent

2 counsel from asking him about his testimony relating to the

3 document.

4          MR. HINDS:  Thank you, your Honor.

5          THE COURT:  Okay.

6 BY MR. MCCULLOUGH:

7 Q    Okay.  What page -- it is Exhibit 154, is that correct?

8 A    Yes.

9 Q    And 154 has been, you know, marked as an exhibit.  And

10 can you tell me what page it is of Exhibit 154 that you're

11 referring to?

12 A    I believe it's on several pages.  Which one would you

13 like?

14 Q    I'm talking about the $10,000 check that you said --

15 A    Yeah.  I believe it's on several pages.

16 Q    Well, where's the first one?  How about page 10?  And

17 going down, the last, we get to the date, 12-30-2002.  Do

18 you see that?

19 A    I thought I was supposed to -- do you want me to go --

20 tell me where.

21 Q    154.010, page 10.  It's your page 2415 if that helps at

22 all.  It's also at the bottom of the, it's down there at the

23 bottom of the page.  Do you see that?

24 A    Yes.

25 Q    Okay.  And then you go down the date and you see the

162

1  12-30 date and a check to Randy, to Randal Johnson, Viro

2  rent?

3  A    Yes.

4  Q    Okay.  That's what you're referring to, right?

5  A    That's one of the two entries I remember.

6  Q    Okay.  Well, the other one is essentially to tell us --

7  it says the same thing, right?

8  A    I don't know.  I was -- I'll find it for you if you

9  want me to.  Sometimes one entry will have more information

10 than the other entry.

11 Q    Well, do you want to find the other one?

12 A    Sure.

13 Q    Okay, go ahead.

14 A    Okay.  Could I tell the attorney what I'm looking for?

15 Maybe someone can help me find it.  It's under consulting.

16 That's what I'm trying to find, the consulting category and

17 the expense category.

18         THE COURT:  Rick, why don't you turn the lights up

19 for just a moment.

20         THE WITNESS:  Thank you.

21         MR. MCCULLOUGH:  It's on page 154.020.

22         MR. HINDS:  Thank you, your Honor.

23         THE WITNESS:  One-zero-three-eight.  This is a

24 transaction.  This isn't the category, Jim.

25 //

163

1  BY MR. MCCULLOUGH:

2  Q    Okay.  Well, let's -- you've indicated that the check

3  was for $10,000 payable to Randy Johnson.  And in the memo

4  line it said, "for rent," right?

5  A    Yes.

6  Q    Okay.  And --

7             MR. HINDS:  Viro.

8             MR. MCCULLOUGH:  What did I say?

9             MR. HINDS:  Rent.  Just Viro.

10             MR. MCCULLOUGH:  Okay.  Well, we're all going a

11  little flat weight at this point.

12  BY MR. MCCULLOUGH:

13  Q    But let's just stick then with page 10 of this Exhibit

14  for a moment.  And -- but this is where you found the

15  information that told you about the check, right?

16  A    This was one of the several places.  I believe I found

17  it three different places.

18  Q    In the same document?

19  A    I believe it was in the same document, yes.

20  Q    Okay.  Do we really need to see any other if it's in

21  that document?

22  A    Well, yes.  The other entry was important because it

23  shows it was classified as consulting and deducted on the

24  tax return.

25  Q    Okay.  Okay.  Well, let's just -- you've indicated

164

1  that's what it says.  We won't worry about it at the moment.

2      Now, you didn't prepare this document, did you?

3  A    No.

4  Q    And you don't know who did prepare this document?

5  A    No.

6  Q    And you don't know whether they prepared this document

7  accurately or inaccurately, do you?

8  A    Yes.

9  Q    Well, you do know?

10 A    Yes.

11 Q    How do you know?

12 A    Because I've done 250 to 3,000 (sic) checks for

13 individual checks that I have against this ledger, and every

14 single one of the 250 to 300 checks correlate exactly with

15 this document.  And there was not one mistake of those 250

16 to 300 that I checked it with.

17 Q    "Not one mistake"?

18 A    Not one mistake and, therefore, I concluded that this,

19 by this check, I concluded that the document was accurate.

20 Q    Okay.  But you still don't know if it was accurate, do

21 you?  I mean, that's --

22 A    Yes.

23 Q    You weren't there when it happened?  When it was put

24 down.  You don't know who put it down.  You don't know if

25 they might have made a mistake, right?

165

1  A     Incorrect.

2  Q     So, in your considered expert opinion, there's no

3  question in your mind whatsoever that there is a check

4  payable to Randy Johnson for $10,000, which says, "Viro

5  rent" on it?

6  A     No doubt.

7  Q     And on this Exhibit that we've been looking at, we

8  don't have a check number, do we?

9  A     No.

10  Q     Now, if you're entering into -- this is a QuickBooks

11  program, isn't it?  Are you familiar with QuickBooks?

12  A     Yes.

13  Q     Okay.  This is a QuickBook record, isn't it, program?

14  A     I think it is.

15  Q     Okay.  And as you're entering in checks, you would

16  enter in a check number if you had it, wouldn't you?

17  A     Sometimes, yes, sometimes, no.

18  Q     Well, if you had the number and you were trying to be

19  accurate and that, you would enter it in, wouldn't you, to

20  be complete?

21  A     Sometimes, yes, sometimes, no.

22  Q     Well, if you want to be complete, would you enter it?

23  A     Yes.

24  Q     Okay.  Now, is there any other evidence that you can

25  point to that shows that this check, this supposed check,

166

1 really existed?

2 A    Yes.

3 Q    What?

4 A    I cross-referenced a ledger with the tax return and

5 verified that it was deducted on the Jj & A federal income -

6 - Corporate Income Tax Return 1120 for the year 2002.

7 Q    Any other evidence?

8 A    No.  I think that's --

9 Q    You think that's --

10 A    I think there was three entries plus the verification

11 was on the tax return.

12 Q    So you're --

13 A    Plus my three -- 250 to 300 checks.  That's about it.

14 Q    Okay.  So, you did enough as an expert to verify this,

15 and you didn't have to do anything further?

16 A    No.

17 Q    Was there anything further you could have done?

18 A    There's always something further someone can do.

19 Q    Anything that you can think of that would be relatively

20 simple?

21 A    Yes.

22 Q    What's that?

23 A    Ask the Debtor for a copy of the check.

24 Q    Good.  Now, in this particular case, we don't know

25 where the is.  Nobody's seen it to your knowledge, right?

167

1   A     That's not true.

2   Q     Okay.  Well, I assume what you mean is that Randy

3   Johnson would have seen the check when it was issued.

4   A     I would say he was one of the persons.  It could have

5   been Randy, it could have been Jay as well, the bookkeeper

6   as well, and whoever prepared the tax return and deducted it

7   on the tax return.  So there's a number of people that could

8   have seen it.

9   Q     Well, wouldn't it also be perhaps a good idea if you

10  want to really nail down this fraudulent transaction, make

11  absolutely positive that it's true, because you're alleging

12  fraud, right?

13  A     Yes.

14  Q     No question in your mind it's fraudulent?

15  A     "No question."

16  Q     To really nail that down, wouldn't you want to go to

17  the bank statement of account to see this item?

18  A     No.

19  Q     That wouldn't mean anything, huh?

20  A     I wouldn't say that it didn't mean anything.  I mean,

21  when I order -- when I audit giant corporations and they

22  have a room full of evidence from one year, I pick and

23  choose.  And in this case, I probably looked at 50-percent

24  of the entries, which I never do in my audits.  That's an

25  extremely large sample.  And I didn't find one error after

*Briggs Reporting Company, Inc.*

168

1  the 250 to 300 samples I checked.

2  Q    Well, I did a little extra work for you.  I looked at

3  the bank statement.  Perhaps you should look at it, because

4  you've made a terrible, terrible allegation.

5          THE COURT:  Okay.

6          MR. HINDS:  Mr. McCullough --

7          MR. MCCULLOUGH:  And if you would just --

8          THE COURT:  Okay, okay.  Can we just ask the

9  question, please?

10         MR. MCCULLOUGH:  Yes.

11 BY MR. MCCULLOUGH:

12 Q    Go to Exhibit 4-B.090.

13         MR. MCCULLOUGH:  And perhaps we could have the

14 lights dimmed so we could put this on the screen, please.

15 And then blow that up.

16 BY MR. MCCULLOUGH:

17 Q    You have Exhibit 4-B, the bank statement of account for

18 the Jj & A Architects, Inc. account at Bank of America?

19 Yes?

20 A    Yes.

21 Q    And the check that you're talking about was dated

22 December 30th?

23 A    Yes.

24 Q    For $10,000?

25 A    Yes.

169

1  Q    If we look at the bank statement of account, do you see

2  the date there of December 30th?

3  A    Yes.

4  Q    And do you see where it says, "money transfer

5  California, transaction," then gives a transaction number.

6  Sender reference number, "SRC: Bank funds transfer," and

7  then it says "beneficiary."  Do you see where it says,

8  "Heron Brooke Patio Homes"?

9  A    Yes.

10 Q    Do you see $10,000?

11 A    Yes.

12 Q    Do you see a check for $10,000 on that date?

13 A    I only see one thing on the screen.  I don't see it on

14 this screen.

15 Q    Well, if you -- if the QuickBooks record is so

16 accurate, the person writing it down knew exactly what they

17 were doing and they had in front of them a check, which they

18 didn't put the check number down in a QuickBooks record, but

19 they had the check and they could see that it's payable to

20 Randy Johnson for $10,000, that was paid on December 30th,

21 you would find that check in the bank statement of account,

22 wouldn't you?

23 A    I don't think I ever said it was paid December 30th,

24 2002.

25 Q    That's what the QuickBooks records are showing.

*Briggs Reporting Company, Inc.*

170

1  A      No, it's not.

2  Q      Okay.  Okay.  Okay.  Where do you find the $10,000

3  check paid?

4  A      I don't -- I could give you an explanation.  I know I'm

5  not supposed to -- I'm not going to -- I don't know where

6  it's at.  I can tell you, I don't know where it's at.  I'm

7  going to just say that.  If you want an explanation just

8  ask.

9  Q      If you don't have the check, you don't know it's

10  payable to Randy Johnson, do you?  Just because it's on a

11  record that nobody can authenticate as being reliable and

12  trustworthy, doesn't mean it actually existed, does it?

13  A      Yes.

14  Q      "Yes," I'm right or --

15  A      No.  Yes, it actually existed, this evidence existed.

16         MR. HINDS:  Your Honor, we seem to be right up on

17  3:30, which is our due quitting time.

18         MR. MCCULLOUGH:  Well, we promised to finish this

19  one very quickly, your Honor.

20         THE COURT:  I assume less than two minutes.

21  BY MR. MCCULLOUGH:

22  Q      Is it still your opinion, Mr. Lapides, that there was a

23  fraudulent transaction conducted between Randy and Jay and

24  Michael McFall in issuing a $10,000 check against the Jj & A

25  account, with supposedly Viro rent written it the memo line?

171

1        MR. HINDS:  Objection, your Honor.  I think that

2   misstates his prior testimony, because he never said it was

3   check, it was a transaction.

4        MR. MCCULLOUGH:  Can he answer that question?

5        THE COURT:  Well, there is no objection, but it

6   misstates his testimony regarding the issuance of a check.

7   And, unfortunately, I can't remember what he said exactly,

8   unless you want to go back to one of the other screens that

9   has the passage from his report where he mentions the

10  $10,000.

11       MR. MCCULLOUGH:  That's what I want.  Let's see.

12  Let's go to Exhibit 227, page 75.  And if you could roll up

13  this part here.

14  BY MR. MCCULLOUGH:

15  Q    You're reading from your report, the one where the

16  table of contents references this fraudulent transaction,

17  page 75.  It reads:

18            "Jj & A issues $10,000 check for

19            Jay's rent.  As previously noted and

20            discussed, Jj & A issued a check on 12-

21            30-2002 to Randal Johnson for $10,000

22            with a memo stating, 'Viro rent.'"

23       You haven't seen the check.  You don't know if it

24  really exists, and the bank statement doesn't show it being

25  paid.  It shows a wire transfer of $10,000.

172

1    Is it still your sworn testimony as an expert that

2 Randal Johnson and Jay Johnson and Michael McFall

3 participated in a fraudulent transaction with respect to

4 that transaction?

5 A    Yes.

6         MR. MCCULLOUGH:  No further questions.

7         THE COURT:  Okay.  With that, I guess we are

8 adjourned.  I still don't have an answer, I don't think.

9 Let me check before -- part of a complication is, one of the

10 parties is pro se.  So, let me check to see whether we

11 haven't -- had any information regarding that trial.

12        Okay.  So I don't have anything to report at this

13 time, but certainly as soon as we know, we will let both

14 counsel know the status.

15        MR. MCCULLOUGH:  Great.

16        MR. HINDS:  Thank you, your Honor.

17        THE CLERK:  As of right now it's continued for 90

18 days --

19        THE COURT:  No, it -- right now, it's still

20 reserved for the three days -- well, three-and-a-half days

21 in April.  So, it's --

22        THE CLERK:  The 23rd?

23        THE COURT:  April 22nd, 23rd, 24th and 25th.  And

24 the date that we're waiting for to confirm is the 21st.

25        MR. MCCULLOUGH:  And that 22nd would be a half day

173

1  in the morning?

2          THE COURT:  Correct.

3          MR. MCCULLOUGH:  Thank you, your Honor.

4      (Proceedings concluded.)

5

6          I certify that the foregoing is a correct

7  transcript from the electronic sound recording of the

8  proceedings in the above-entitled matter.

9  /s/ Holly Martens          8-3-15
   Transcriber                Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*